OPINION
This case presents the timely appeal of the decision of the Columbiana County Court of Common Pleas convicting appellant, Gordon L. Reynolds, of one count of aggravated murder by prior calculation and design with two death specifications, and sentencing him to death. For the following reasons, the decision of the trial court is affirmed.
 FACTS
The facts indicate that Lynn and John Hanna were married on June 11, 1965. In 1976 they moved into their new home at 50655 Stagecoach Rd., East Liverpool, Ohio. In January of 1984, the Hannas separated. On July 1, 1984, Lynn and John Hanna were divorced, with Lynn receiving the real estate on Stagecoach Rd. in the divorce. At the time of the divorce the Hannas had two children, Michael Hanna and Melissa Hanna Thayer, who resided with their mother.
Around the time of the divorce, Lynn Hanna became involved with the appellant as his girlfriend. Soon after the divorce, John Hanna fell behind in the mortgage payments and the real estate was due to be repossessed by the mortgage holder.
There was testimony from both children that in early December of 1985, at the Stagecoach Rd. address, Lynn Hanna told her children they were going to set the house on fire to collect the insurance proceeds. The appellant was also present at this time and told the children to "make sure you get everything out of the house * * *." The daughter, Melissa, testified that she noticed a strange automobile parked in the garage just before the fire occurred, which was not her mother's usual automobile. She also noted that all the better furniture pieces had been removed and replaced with older pieces of furniture. The better replaced furniture pieces were later observed by Melissa at the appellant's residence.
On December 20, 1985, a fire at the Stagecoach Rd. address destroyed the house and all the contents along with the automobile. A fireman at the scene believed the fire to be suspicious and called in the State Fire Investigator. The State Investigator could find no natural cause for the fire, and suspected arson, but without any type of proof discontinued his investigation. No arson charges were ever filed in this incident. On June 30, 1986, the net insurance proceeds of about $25,000 were paid to Lynn Hanna. Also on June 30, 1986, the appellant made a cash deposit into his bank account of $12,000.
On July 29, 1986, the appellant purchased a wedding ring at a jewelry store in East Liverpool. The next day, July 30, 1986, Lynn Hanna brought in the ring to be sized for her finger.
On January 28, 1987 appellant married a Kimberly Reynolds, and at times resided with both Kimberly Reynolds and Lynn Hanna. Kimberly Reynolds subsequently left appellant due to his continued involvement with Lynn Hanna and later obtained a divorce from appellant.
On February 4, 1987, Lynn Hanna was seen by Dr. Pannozzo in Youngstown, Ohio in regard to a back injury. At that time Dr. Pannozzo took X-Rays of Lynn in conjunction with her treatment. Also on June 22, 1988, Lynn Hanna was seen by Dr. Wittenaur at East Liverpool Hospital concerning some problems she was having and a medical record was compiled. X-Rays were also taken of Lynn Hanna at the East Liverpool Hospital during a prior hospitalization.
Apparently troubles began to arise between appellant and Lynn Hanna. In late August of 1988, appellant was observed in an argument with Lynn in the doorway of his residence, whereby appellant knocked her down, kicked and choked her.
On August 31, 1988, Melissa Thayer last talked to her mother on the telephone. Lynn Hanna was never seen or talked to after this contact by her daughter. On or just before September 3, 1988, Lynn Hanna disappeared.
On September 3, 1988, appellant met with a friend of his named John Morrell at a restaurant in East Liverpool. At that time appellant gave Mr. Morrell a note and indicated to Mr. Morrell that if anyone asked, that appellant was with Mr. Morrell from 8:00 to 10:00 p.m. on that day. That note was later given to the Columbiana County Sheriff.
On September 4, 1988, Melissa Thayer began to make numerous calls to her mother. Melissa never got any answer at her mother's residence and began to be concerned about her whereabouts. Melissa contacted appellant and appellant told Melissa and her husband that Lynn took everything and left him.
On September 4, 1988, Tammy Springer, wife of Gordon Reynolds' son, was called to her mother-in-law's house. When she arrived there she found appellant, Tammy Moffo (Gordon Reynolds' daughter), and Beth Springer (her mother-in-law). Appellant's van was there with some of Lynn Hanna's belongings. Ms. Springer was told to take what she wanted. She took two necklaces and later turned them over to the police who were investigating Lynn Hanna's disappearance.
On September 6, 1988, Melissa Thayer filed a "missing persons report" with the East Liverpool Police. Nothing was ever filed by the appellant.
On September 9, 1988, appellant recorded a quit claim deed on property located at 11534 State Rt. 170, East Liverpool, transferring the property from Lynn Hanna to appellant. On the same day appellant transferred a 1969 Brookwood Manufactured home by certificate of title from Lynn Hanna to appellant. Both documents were signed by Lynn Hanna on August 25, 1988. Also, on September 9th or early September 10, 1988, a West Virginia deputy sheriff stopped appellant north of Newell Bridge, on St. Rt. 2 near Chester, West Virginia. The deputy, who knew the appellant, noticed that appellant seemed to have been drinking and acted "nervous and fidgety." Due to an emergency call the deputy did not arrest appellant but continued on to respond to the emergency.
From September 10th through September 24, 1988, seven various parts of a dissected human body were found floating in the Ohio River south of the Newell Bridge inside green plastic garbage or trash bags and recovered by various individuals. The body parts were sent to West Virginia pathologists and forensic pathologists for examination since the first parts were discovered near the West Virginia shore line. One of the deputies who picked up a severed arm noticed that there appeared to have been a ring on the hand at one time.
Drs. Vista, Frost and Sopher examined the remains, as they were recovered, beginning on September 14th through September 28, 1988. On September 15th and the 20th deputy sheriff White picked up X-Rays from Dr. Pannozzo and East Liverpool Hospital of Lynn Hanna on whom they had a missing person's report and who fit the preliminary description of the victim. After comparison of the medical records and X-Rays of Lynn Hanna with the comparable surgical scar and X-Rays of the victim, Dr. Sopher determined the victim to be Lynn Hanna. Dr. Sopher also found evidence of a bullet wound to the chest which would have gone into the lung of the victim. Dr. Sopher noticed that the lung with the possible bullet had been intentionally removed. This lung was never recovered nor was Lynn Hanna's head which had also been removed.
On September 21, 1988, Deputy White and Deputy McDonald went to 1750 LaCroft Ave., where appellant and Lynn Hanna resided to question appellant. At the scene they observed that appellant's van had been scrubbed very clean in the back and smelled from disinfectant like Clorox, while the front of the van was very "messy." Later testimony by an OBCI forensic scientist indicated that the cleaning of the van with Clorox or other cleaning agents would destroy blood residue evidence. No blood residue evidence was ever found in the van.
On December 29, 1988 appellant brought to the jewelry store in East Liverpool the same ring that he had purchased from that store on July 29, 1986 and which Lynn Hanna had resized on July 30, 1986. He had this ring resized to fit his finger.
Nothing further transpired in this investigation due to a lack of evidence until February of 1994, when the Columbiana County Sheriff was contacted by the appellant's son, Gordon Springer, who was incarcerated in West Virginia on drug related charges. On February 18, 1994, Gordon Springer informed the Sheriff that appellant had in fact killed Lynn Hanna to cover their arson. Mr. Springer agreed to tape conversations with his father for the Sheriff. Mr. Springer also at this time gave the Sheriff jewelry items which had belonged to Lynn Hanna.
On July 27, 1994, the sheriff was contacted by Richard Thomas, a friend of the appellant, who informed the sheriff that appellant told him he killed Lynn Hanna to cover the arson they had committed on her property. Mr. Thomas also testified that at the approximate time Lynn Hanna disappeared he was at appellant's residence and smelled something very strong, like a dead animal or person, coming from the appellant's van. Mr. Thomas agreed to wear a wire to record his conversations with the appellant but nothing applicable resulted from the tapings.
On September 29, 1994, the Columbiana County Grand Jury indicted appellant, Gordon L. Reynolds, for the aggravated murder of Hanna. The indictment charged one count of aggravated murder by prior calculation and design, Ohio Rev. Code Ann. § 2903.01(A), two death specifications, Ohio Rev. Code Ann. § 2929.04(A)(3) and (A)(8); and a firearm specification, Ohio Rev. Code Ann. § 2941.141(A).
On September 30, 1994, appellant appeared with counsel before the Columbiana County Court of Common Pleas. Bail was set in the amount of $500,000.00. Columbiana County Judge David Tobin was a witness in the case, and recused himself on October 5, 1994. The case was first transferred to Columbiana Common Pleas Judge Douglas C. Jenkins, who later recused himself upon the filing of an affidavit of disqualification. On October 31, 1994, Judge J. Warren Bettis was designated to sit by assignment. Appellant filed numerous pretrial motions, including a motion for a change of venue. Pretrial hearings were held on October 5, 1994; October 13, 1994; November 18, 1994; March 18, 1995; and March 25, 1995.
Jury selection commenced on March 27, 1995. The evidentiary portion of the trial began on April 6, 1995. On April 21, 1995, the trial jury found appellant guilty of the crime and the specifications. The penalty phase was commenced on April 26, 1995, and on the same day, the trial jury recommended that appellant be sentenced to death. The trial judge sentenced appellant to death on April 28, 1995, and this appeal followed.
 ASSIGNMENTS OF ERROR ASSIGNMENT OF ERROR NO. 1 Appellant was deprived a fair and impartial jury, U.S. CONST. amend. VI and XIV, OHIO CONST. art. I, §§ 1, 2, 5, 10 and 16; and, appellant's death sentence was not reliably determined, U.S. CONST. Amend. VIII and XIV, OHIO CONST. art. I, §§ 1, 2, 9, and 16, due to a combination of improper standards of excusal employed by the trial court, and ineffective assistance of counsel when his counsel failed to (i) object to the improper standards of juror excusal employed by the trial court; (ii) object to proper questioning that the trial court curtailed; (iii) challenge for cause jurors whose answers on voir dire expressed an innate inability to follow the court's instructions of law; and (iv) argue that jurors who did not meet the Ohio Standard of Excusal should not be excused.
 ASSIGNMENT OF ERROR NO. 2
The trial court erred in failing to dismiss the death specifications, motion to dismiss death specifications, T.p. Vol. unnumbered, March 25, 1995, p. 101, Vol. XVI, p. 3542; as a result, appellant's death sentence violates U.S. CONST. Amend. VIII and XIV and OHIO CONST. art. I §§ 1,2, 9, and 16.
 ASSIGNMENT OF ERROR NO. 3
The trial court erred in overruling appellant's motions for acquittal pursuant to OHIO CRIM. R. 29; appellant's convictions and death sentence violate U.S. CONST. amend. VII and XIV and OHIO CONST. art. I, §§ 1,2, 9, and 16 because the convictions are against the manifest weight of the evidence.
 ASSIGNMENT OF ERROR NO. 4
The trial judge deprived appellant of a fair trial by his own conduct and by failing to guard against factors which impermissibly undermined the constitutional presumption of innocence.
 ASSIGNMENT OF ERROR NO. 5
The trial court erred in overruling appellant's motion to dismiss, filed March 22, 1995; see, also, motion to require state to elect between two death penalty specifications, and motion to dismiss death penalty specifications, both filed March 17, 1995, because the Ohio Capital Laws, both as enacted and as interpreted, deny a capital defendant meaningful appellate review, an indispensable ingredient in imposing a death sentence consistent with U.S. CONST. amend. VIII an XIV and OHIO CONST. art. I, §§ 1, 2, 9, and 16.
 ASSIGNMENT OF ERROR NO. 6
OHIO CONST., art. I, § 10 and U.S. CONST. amend. VI and XIV, which mandate a trial by a fair and impartial jury, require a court to either conduct an investigation or permit reasonable investigation to be conducted when there appears any indicia of juror misconduct.
 ASSIGNMENT OF ERROR NO. 7
The trial court erred in permitting the prosecutor to admit certain photographs as exhibits, in both the guilt, T.p., Vol. XII, p. 2680 and the penalty phases, T.p., Vol. XVIII, p. 3940, thereby denying appellant a fair trial pursuant to U.S. CONST., amend. VI and XIV and OHIO CONST. art. I, §§ 2, 10, and 16.
 ASSIGNMENT OF ERROR NO. 8
The trial court erred in overruling appellant's oral motion for discovery sanctions, T.p. Vol. XV, p. 3485, thus denying appellant his liberties under U.S. CONST. amend. VI, VIII and XIV and OHIO CONST. art. I, §§1, 2, 9, 10, and 16.
 ASSIGNMENT OF ERROR NO. 9
The trial court erred in failing to dismiss the death penalty specifications, and in imposing the death sentence for the death of Lynn Hanna. A reviewing court may not compare death sentences only with other death sentences and still follow the constitutional demands for a proportionality review, nor may a reviewing court conduct a meaningful proportionality review without sufficient data on jurors' rationale for choosing a life sentence over the death penalty, for to do so violates the guarantees of U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, §§ 1 and 9.
 ASSIGNMENT OF ERROR NO. 10
The trial court permitted the introduction of hearsay evidence in violation of appellant's liberties specified in U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 1, 2, 10, and 16.
 ASSIGNMENT OF ERROR NO. 11
The trial court erred in failing to dismiss the death specifications. The death penalty violates the United States and Ohio Constitutions, U.S. CONST. amend. VIII and XIV, OHIO CONST. art. I, §§ 1, 2, 9, and 16, because the irrevocable nature of the penalty makes it impossible to cure errors, including actual innocence.
 ASSIGNMENT OF ERROR NO. 12
The trial court erred in failing to dismiss the death specifications, because the death penalty violates U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 1, 2, 9 and 16 since the methods of execution violate evolving standards of human decency, an integral part of due process.
 ASSIGNMENT OF ERROR NO. 13
The trial court erred in refusing to dismiss the death penalty specifications, because Ohio's death penalty violates OHIO CONST. art. I, §§ 1, 2, 5, 9, 10 and 16.
 ASSIGNMENT OF ERROR NO. 14
The trial court erred when it failed to grant appellant's motion for a change of venue, judgment entry, March 29, 1995, thus depriving appellant of a fair trial guaranteed by U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 1, 2, 5, 10, and 16. That error, combined with ineffective assistance, deprived appellant of due process.
 ASSIGNMENT OF ERROR NO. 15
The cumulative effect of errors denied appellant a fair trial and due process; accordingly, neither his convictions nor death sentence may stand under U.S. CONST. amend. XIV and OHIO CONST. art. I, §§ 1, 2, 9, 10, and 16.
 A
In Assignment of Error No. 1, appellant alleges that the death qualification process used by the trial court, and also generally used in Ohio during jury selection, deprived him of a fair and impartial jury. Appellant argues that the trial court improperly used the standard ofWainwright v. Witt (1985), 469 U.S. 412 to death qualify the jury. Appellant further argues that his trial counsel's handling of the voir dire constituted ineffective assistance of counsel. Appellant's allegations are without merit.
The Ohio statute on challenging jurors for cause in capital cases is R.C. 2945.25, which states in relevant part that a person called as a juror in a criminal case may be challenged for cause when:
 "(C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.
The Ohio Supreme Court has recently stated in the case of State v.Johnson (2000), 88 Ohio St.3d 29:
 "In State v. Rogers (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, this court held that, in accordance with Witt, `[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'"
This court is not required to hold the trial court to a higher standard than is required by statute and as affirmed by the Ohio State Supreme Court. R.C. 2945.25(C) does not set a higher standard than is outlined inWitt, supra. See State v. Roe (1989), 41 Ohio St.3d 18.
In this case appellant takes issue with the voir dire of sixteen different jurors, only three of which were actually seated on the jury; jurors Phelps, Baxter and Mentzer.
In the case of David Phelps (Tr. 19), the court asked Mr. Phelps how he felt about the death penalty and whether or not those feelings would affect his ability to follow the law.
 "THE COURT: All right. Are you in favor of or opposed to the death penalty?
"DAVID PHELPS: In favor of.
 "THE COURT: If this case should reach a penalty phase would you automatically vote for the imposition of the death penalty regardless of the evidence and the law?
"DAVID PHELPS: No, sir.
 "THE COURT: Would your views on the death penalty prevent or substantially impair your ability to follow the law in deciding the sentence."
"DAVID PHELPS: No, sir." (Tr. 18).
When questioned by Prosecutor Robert Herron, Phelps responded as follows:
 "ATTY. HERRON: You have no moral or any other personal beliefs that would prevent you or preclude you from considering all of the alternative penalties allowed in this case by law."
"DAVID PHELPS: No, I could consider them all.
 "ATTY. HERRON: Sir, do you have any preconceive (sic) opinions as to any specific crimes that have to be involved before you could impose a death penalty? Or do you believe you could follow the Court's instruction as to the law in this particular case?
"DAVID PHELPS: I could follow the Court's instructions.
 "ATTY. HERRON: An (sic) in your — in the process of forming your opinion on the death penalty had you come to any conclusions, any decisions personally as to the nature of any type of crime that would have to be committed before you would consider it?
 "DAVID PHELPS: It certainly would have to be very serious, murder, rape, things like this would be in my thinking." (Tr. 20-21).
Appellant's attorney also inquired of Mr. Phelps as to his ability to follow the law.
 "ATTY. HUTSON: Okay. So, what you're telling us is that you think you would be able to follow the Judge's instructions.
"DAVID PHELPS: Um huh (indicating yes.)
 "ATTY. HUTSON: That there may be other appropriate sanctions besides this severe sanction, the death penalty.
"DAVID PHELPS: Um hum (indicating yes.)" (Tr. 27-28).
 The Court then took further steps to assure Mr. Phelps could and would follow the law.
 "THE COURT: Now, as I understand you correctly regardless of your view on the death penalty, you will carefully listen to the evidence, you will follow and look at the exhibits that are admitted into evidence, and you will follow the Judge's instructions on the law?
"DAVID PHELPS: Yes.
 "THE COURT: And from that you will arrive at your independent judgment as to whether or not the death penalty should be applied?
"DAVID PHELPS: Yes." (Tr. 28).
Contrary to appellant's allegations, clearly Phelps was asked sufficient questions by the Court, the prosecutor and defense attorney to ascertain his ability to follow the law. Also Mr. Phelps was not challenged for cause by appellant's attorney.
Appellant further argues in this assignment of error that his counsel was not permitted to ask enough questions of juror John Baxter during voir dire to determine his views on the death penalty. Defense counsel also declined to challenge this juror for cause.
Mr. Baxter was questioned extensively by the Court, prosecutor, and defense counsel and indicated repeatedly that he would be able to follow the law.
 "THE COURT: All right. Are you in favor of or opposed to the death penalty?
"JOHN BAXTER: In favor of.
 "THE COURT: All right, now, listen carefully John to this question. If this case should reach a penalty phase, would you automatically vote for the imposition of the death penalty regardless of the evidence and the law?
"JOHN BAXTER: Could you repeat that?
 "THE COURT: Sure. Sure. If this case should reach a penalty phase would you automatically vote for the imposition of the death penalty regardless of the law and the evidence?
"JOHN BAXTER: No.
 "THE COURT: All right. Would your views on the death penalty prevent or substantially impair your ability to follow the law in deciding the sentence?
"JOHN BAXTER: No." (Tr. 105).
 "ATTY. HUTSON: Okay. Do you think that anyone who purposefully takes someone else's life, purposefully kills someone, deserves the death penalty?
"ATTY. HERRON: Objection.
"THE COURT: Sustained.
"JOHN BAXTER: Purposefully —
"THE COURT: — wait a minute. Don't answer.
"ATTY. HUTSON: Don't answer that.
 "THE COURT: That's not the law in this case. The law in this case is clear, that if you find the defendant guilty of the crime charged, Capital Murder, and the Specifications, then you will g to the, what we call phase two, the penalty section. And you would listen to the evidence in that case of aggravating circumstances, we don't know what they are yet, if any. You would listen to the mitigating factors, if any, we don't know what they are yet. And then I would tell you, you based upon the evidence in the guilt phase or the penalty phase, you could have the option of the death penalty, if you find the aggravating circumstances outweigh the mitigating factors. If you find that they don't, then you would have the option of twenty years to life, or thirty years to life.
"JOHN BAXTER: Um huh (indicating yes).
"THE COURT: Do you understand that?
"JOHN BAXTER: Yes, sir.
 "THE COURT: Those are the three options that are available.
"JOHN BAXTER: Um huh (indicating yes).
 "THE COURT: Could you follow my instructions on the law in that regard?
"JOHN BAXTER: Certainly.
"THE COURT: I beg your pardon?
"JOHN BAXTER: Absolutely." (Tr. 110-112).
Appellant did not challenge John Baxter for cause.
Mr. Baxter indicated in his responses he would be fair and impartial and apply the law as instructed by the Court.
In the case of juror Carol Mentzer, the Court first inquired as to her stand on the death penalty.
 "THE COURT: Are you in favor of or opposed to the death penalty?
 "CAROL MENTZER: I don't have any opinion on it. It depends on what the circumstances show." (Tr. 164).
Appellant again claims with regard to this juror that he was denied due process because the trial court refused to allow his counsel to ask enough questions to fully determine the juror's view on the death penalty. In response to questions, however, Ms. Mentzer consistently stated she did not have any predispositions and would follow the law as instructed.
 "ATTY. HERRON: Okay, have you ever given any thought to whether or not you believe that the death penalty is right or wrong?
 "CAROL MENTZER: Well, I've thought about it, but it just depends on what the circumstances is (sic), if it's right or wrong.
 "ATTY. HERRON: Okay. Do you have any moral beliefs, or any other kind of convictions that would preclude you from voting to impose the death penalty if the facts warrant it, and if the law allows it?
"CAROL MENTZER: I wouldn't have any trouble with that.
 "ATTY. HERRON: Do you think that you could sign a verdict form if you find the facts warrant it and the law allows it?
"CAROL MENTZER: Sure.
 "ATTY. HERRON: That imposes the death penalty on a defendant?
"CAROL MENTZER: Yes.
 "THE COURT: Now, I am going to require you to go the other two routes when you do that.
 "ATTY. HERRON: Okay, Your Honor. Ma'am, could you sign a verdict form for a lesser sentence if the facts and the law warrants it?
"CAROL MENTZER: Sure.
 "ATTY. HERRON: Do you think that you would opt for a lesser penalty just to avoid having to impose the death penalty?
"CAROL MENTZER: No.
 "ATTY. HERRON: Now, the Court will instruct you on the law, and you will determine as a juror, along with the other jurors what the facts in this case are. Do you think that there are any things that you would require over and above what the Court tells you the law is before you could vote for a verdict that would result in the death penalty being imposed?
"CAROL MENTZER: No.
 "ATTY. HERRON: You wouldn't be looking for any specific type of case, or specific set of fact pattern —
"CAROL MENTZER: — no.
 "ATTY. HERRON: That you would have to have to satisfy you before you could impose the death penalty —
"CAROL MENTZER: — no.
 "ATTY. HERRON: — vote for a verdict to impose the death penalty?
"CAROL MENTZER: No.
 "ATTY. HERRON: So, you think you can take the law as the Court instructs you, in terms of what matters are to be properly considered, and consider all of the alternatives that the Court gives you that are available for sentencings in this case?
"CAROL MENTZER: Um huh (indicating yes.) Yes."
(Tr. 165-167).
Appellant's Attorney Stacey explained the available sentences should the defendant be found guilty.
 "ATTY. STACEY: All right. If you found someone guilty of murder with calculation and design there are three sentences that you would have the option of adopting. Do you understand that?
"CAROL MENTZER: Um huh (indicating yes.)
 "ATTY. STACEY: The first sentence being obviously the death penalty. The second sentence that you have an option of would be twenty years to life, with the possibility of parole after twenty years; do you understand that?
"CAROL MENTZER: Yes.
 "ATTY. STACEY: Do you understand also that you have a third option of thirty years to life with the possibility of parole after thirty years. Okay?
"CAROL MENTZER: Um huh (indicating yes.)
 "ATTY. STACEY: Now, those are your three options. Are you telling us that you would be able to look at the various facts, circumstances, aggravating circumstances, which have not been explained to you, nor do you know anything about, at least in regards to this case at this point. Uh . . . nor do you know anything about mitigating factors, at least at this point in time. But would you be able to take a look at all the facts and circumstances in connection with any case, wherein you found someone guilty of murder with prior calculation and design, and would you be able to likewise, if the facts and circumstances did not justify the imposition of the death penalty, would you be able to choose one of the other two options available, as I explained them to you?
"CAROL MENTZER: Yes.
". . .
 "ATTY. STACEY: All right. So you would be able to weigh the facts and circumstances, and based on those facts and circumstances either pick the death penalty, twenty to thirty years to life?
"CAROL MENTZER: Yes." (Tr. 170-171).
After extensive questioning by the court, the prosecutor and appellant's attorney, juror Mentzer indicated that she could and would consider the facts and follow the law as set out by the trial court.
None of the three jurors which were actually seated on this jury and whom were brought into issue by the appellant, "state that under no circumstance will they follow the instructions of the trial judge and consider fairly the imposition of a sentence of death in a particular case," as required by R.C. 2945.25(C).
Appellant in this trial was given twelve peremptory challenges, which was six more than the required minimum as set out in Crim.R. 24, and the exact amount set out in R.C. 2945.21.2. As noted by appellee, if the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged veniremen with a peremptory challenge and exhausts his peremptory challenges before the full jury is seated. State v. Tyler (1990), 50 Ohio St.3d 24, 30-31. In this case the appellant did not exhaust his peremptory challenges. A review of the voir dire here shows that appellant was provided a fair and impartial jury. Assuming arguendo that any of appellant's allegations concerning these three jurors who were actually seated in this case were relevant, any error would be non-prejudicial since appellant did not exhaust his peremptory challenges.
A trial judge must also be given considerable latitude in making decisions regarding challenges for cause. The trial court, along with hearing prospective jurors' responses to voir dire questions, has the benefit of observing the demeanor and body language of these prospective jurors. See State v. Williams (1997), 79 Ohio St.3d 1.
For all the reasons discussed above the appellant was not deprived of a fair and impartial jury due to any improper standards of excusal employed by the trial court.
In the next part of this assignment of error appellant argues that he was denied effective assistance of counsel. Appellant alleges counsel was ineffective when he failed to, (1) object to the improper standards of juror excusal employed by the trial court; (2) object to proper questioning curtailed by the trial court; (3) challenge for cause jurors whose answers on voir dire expressed an innate inability to follow the court's instructions of law; and (4) argue that jurors who did not meet the Ohio standards of excusal should not be excused.
Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, "that counsel's performance was deficient" and, second, "that the deficient performance prejudiced the defense * * * so as to deprive the defendant of a fair trial."Strickland v. Washington (1984), 466 U.S. 668; accord State v. Bradley
(1989), 42 Ohio St.3d 136.
As analyzed above, the trial court's standard for juror excusal utilized in this case has been deemed proper by the Ohio Supreme Court. Thus, appellant's counsel's failure to challenge for cause those jurors who were allowed to remain as potential jurors did not prejudice the appellant, nor deprive him of a fair trial. Also, counsel's failure to object to the trial court's questions based upon the standard set out inWitt, supra was non-prejudicial to appellant.
Appellant's counsel was also not required to object when his questions of the jurors were curtailed by the trial court while appellant's counsel was attempting to introduce an improper standard for jury inclusion in that process.
As discussed above, none of the jurors singled out by the appellant who were seated in this trial expressed any innate inability to follow the court's instructions. Juror Phelps, when questioned by the court responded:
 "THE COURT: Now, as I understand you correctly regardless of your view on the death penalty, you will carefully listen to the evidence, you will follow and look at the exhibits that are admitted into evidence, and you will follow the judge's instructions on the law?
"DAVID PHELPS: Yes." (Tr. 28).
Juror Baxter, when questioned by the court, responded:
 "THE COURT: Could you follow my instructions on the law in that regard?
"JOHN BAXTER: Certainly." (Tr. 110-112).
Juror Mentzer, when questioned by appellant's attorney responded as follows:
 "ATTY. STACEY: * * * if the facts and circumstances did not justify the imposition of the death penalty, would you be able to choose one of the other two options available, as I explained them to you?
"CAROL MENTZER: Yes."
Finally, appellant's counsel was not required to argue that jurors who did not meet the Ohio standard for juror excusal should not be excused.
For all the reasons cited above, this assignment of error, in all its parts, is without merit.
 B
In assignment of error two, appellant argues that the trial court erred in failing to dismiss the two death penalty specifications. Specifically, appellant alleges that the arson, which was the underlying offense in the specifications, was an offense which could not be prosecuted since the statute of limitations had expired in 1991. Also appellant alleges that the specifications were improper because the underlying arson offense was never prosecuted nor proven in this trial beyond a reasonable doubt.
R.C. 2901.13 is the statute related to statute of limitations. This statute states, in relevant part:
 "(A) Except as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:
 "(1) For a felony other than aggravated murder or murder, six years;"
R.C. 2909.03 covers arson, and states, in relevant part:
 "(A) No person, by means of fire or explosion, shall knowingly do any of the following:
 "(1) Cause, or create a substantial risk of, physical harm to any property of another without the other person's consent;
 "(2) Cause, or create a substantial risk of, physical harm to any property of the offender or another, with purpose to defraud;
"* * *
"(B)(1) Whoever violates this section is guilty of arson.
 "(2) A violation of division (A)(1) of this section is one of the following:
 (a) Except as otherwise provided in division (B)(2)(b) of this section, a misdemeanor of the first degree;
 "(b) If the value of the property or the amount of the physical harm involved is five hundred dollars or more, a felony of the fourth degree.
 "(3) A violation of division (A)(2), (3), (5), or (6) of this section is a felony of the fourth degree."
Thus, clearly, the statute of limitations for a felony other than aggravated murder or murder is six years. Arson, of the type involved in this case, constitutes a felony of the fourth degree.
R.C. 2901.13 provides for no statute of limitations on an aggravated murder charge. "In the case of aggravated murder or murder, the grave nature of the offense overrides the general policy behind limiting criminal prosecutions, and therefore no limitation is provided." Committee Comment to H511.
R.C. 2929.04(A) provides in relevant part:
 "(A) Imposition of the death penalty for aggravated murder is precluded unless * * *
 "(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.
"* * *
 "(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding * * *"
At the time of the killing of Lynn Hanna the statute of limitations had not yet expired for the crime of arson. The fire occurred in 1985 and the statute of limitations for arson expired in 1991, three years after the death of Lynn Hanna. It is this court's opinion that the statute of limitations for the death penalty specifications attach at the time of the crime of aggravated murder and run with the aggravated murder charge, not the underlying crime of arson.
Also, a review of R.C. 2929.04(A)(3) does not require that a criminal action be pending. The plain language of 2929.04(A)(8) only requires that the victim was a witness to an offense (arson) and purposely killed to prevent her testimony.
Appellant's allegation that the crime of arson was not proven beyond a reasonable doubt is without merit.
Melissa Thayer, the victim's daughter, testified that along with appellant, her mother told her, "They were going to set the house on fire because the bank was going to take it away and, you know, it was for the money, the insurance money." (Tr. 1894). Appellant told her to, "Make sure you get everything you want out of the house." (Tr. 1894). Melissa also testified that the furniture was changed along with the automobile at the arson location. A fire occurred soon after Melissa's conversation with her mother and the appellant.
The fireman at the fire testified that he believed the fire to be suspicious and called in the fire investigator. (Tr. 2354). The fire investigator could find no natural cause for the fire but not enough proof was found to proceed with charges at that time. (Tr. 2595).
Appellant's son, Gordon Springer, testified that appellant told him, "Well, she was gonna cause him problems, insurance, uh fire." (Tr. 3076). Mr. Springer also testified that, "I've heard him talk about burning the home." (Tr. 3077).
Richard Thomas, an acquaintance of appellant testified that appellant said to him, "Rick, I had to do it. I had to kill her, Lynn Hanna, because of a fire. And he said, hisself (sic), and the other two girls; Lynn Hanna and Kim, set the fire. He had to kill Lynn Hanna because she was gonna go to the authorities and tell." (Tr. 3237).
Michael Hanna, son of the victim also testified that appellant told him after a discussion about a possible fire at the residence, "Make sure you get what you need out of the house." (Tr. 3516).
From all the above, it is clear that there was sufficient evidence, by and through the trial testimony, from which the jury could have decided that the crime of arson was committed beyond a reasonable doubt.
R.C. 2901.05(D) defines reasonable doubt as, "Proof beyond a reasonable doubt, is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." See also State v. Frazier (1995), 73 Ohio St.3d 323.
For all the reasons cited above, this assignment of error two, in all its parts, is without merit.
 C
In assignment of error three, appellant argues that the court erred in denying his Crim.R. 29 motion for acquittal and that his conviction was based upon insufficient evidence, and against the manifest weight of the evidence. Also, appellant here brings into question that the State failed to establish venue.
This court has recently defined "sufficiency" of the evidence where we stated:
 "`Sufficiency' is a legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law * * * In essence, sufficiency is a test of adequacy. Whether the evidence presented in a case is legally sufficient to sustain a verdict is a question of law * * * To reverse a trial court's judgment on a finding of insufficient evidence an appellate court need only have a concurring majority of the reviewing panel." State v. Dickerson (March 30, 1998), Mahoning App. No. 96 C.A. 150, unreported.
Crim.R. 29(A) provides in relevant part:
 "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."
To determine whether or not the evidence is sufficient to prove all elements of the offense beyond a reasonable doubt, a reviewing court must examine all probative evidence and inferences reasonably drawn from that evidence in the light most favorable to the prosecution and then make a determination as to whether or not any rational trier of fact could have found all the essential elements of the offense proved beyond a reasonable doubt.
If reasonable minds could reach different conclusions as to whether each element has been proven, it is proper for a trial court to overrule a Crim.R. 29(A) motion for acquittal and send the case to the jury. Statev. Bridgeman (1978), 55 Ohio St.2d 261, 263.
To determine whether or not a verdict is against the manifest weight of the evidence, a reviewing court must peruse the entire record, weigh all of the evidence, analyze reasonable inferences to be drawn therefrom, consider the credibility of each witness, and make a determination as to whether the jury when resolving conflicts in the evidence "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Davis (1988),49 Ohio App.3d 109, 113, 550 N.E.2d 966, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
This court has also defined, "weight of the evidence" in theDickerson, supra case where we stated:
 "`Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side or the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"
Here, it is clear reasonable minds could have found each element proven beyond a reasonable doubt. West Virginia Medical Examiner Dr. Irwin Sopher conducted a full autopsy of Lynn Hanna's body. He ruled her death a homicide and stated that the cause of death was a gunshot wound. Dr. Vista testified concerning the clean cuts of the body parts. Dr. Sopher also testified concerning the dissection by knife and then by a saw. John Bettis testified that appellant purchased a meat saw in 1988. Richard Thomas testified that Gordon Reynolds was a professional at butchering deer.
The appellant's son, Gordon Springer, testified the appellant told him he broke Lynn's neck and when he found she still had a pulse the next day, he shot her. Dr. Sopher testified that the victim was shot in the chest. He also testified that the bullet wound would have entered the lung and that the lung had been intentionally removed.
Rick Thomas also testified the appellant told him he killed Lynn. Appellant told both Rick Thomas and Gordon Springer he killed Lynn because she was going to talk to authorities about the fire.
Rick Thomas, Tammy Moffo, and Gordon Springer all noticed a horrible odor in appellant's van shortly after Lynn disappeared. Tammy testified that appellant purchased several gallons of bleach and oven cleaner shortly after Lynn disappeared. The van was later discovered by authorities sanitized from the front seats back and smelled of bleach on September 21, 1988.
Only Lynn's daughter, Melissa, called the police to report her missing — not Lynn's boyfriend, the appellant.
From the above it is clear there was sufficient evidence to present to the jury since reasonable minds could reach different conclusions as to whether each element of the crime had been proven. Therefore, it was proper for the trial court to overrule appellant's Crim.R. 29(A) motion for acquittal.
There was also other evidence which added to the weight of the evidence against appellant.
The appellant told his son he shot Lynn, cut up her body, and threw the parts in the Ohio River. Lynn Hanna's body parts in fact surfaced in the Ohio River near Chester, West Virginia beginning the morning of September 10, 1988. The appellant was seen in that area just after midnight September 10, 1988. Deputy Boring stopped and positively identified the appellant on Route Two just south of Chester along the river. The appellant seemed intoxicated and nervous.
Appellant's van had a terrible odor about it which Rick Thomas said he recognized from Vietnam. West Virginia Department of Natural Resources officer Sam Brick testified officials located body parts in the river by the overpowering smell of death.
The Columbiana County Recorder testified the appellant transferred Lynn's real estate into his name days before her death. The Clerk of Courts testified appellant also transferred Lynn's trailer into his name also just days before her death. Virginia Patterson testified that the appellant had Lynn's ring sized to fit himself. Lynn's daughter Melissa testified that a week before her mother died, Lynn told Melissa to keep an eye on her.
There was testimony from John Bettis that appellant had purchased a meat saw prior to Lynn Hanna's disappearance.
There was sufficient evidence that the crime was committed in Columbiana County, Ohio. Appellant's son testified that the appellant told him he killed Lynn at her trailer at 1750 LaCroft in East Liverpool, Ohio. In addition, evidence of premeditation in Columbiana County was presented. The appellant transferred Lynn's real estate and trailer at the Columbiana County Courthouse in Lisbon. The arson was committed in Columbiana County. There is no question venue was established at trial and proper in Columbiana County, Ohio.
For all these reasons, appellant's third assignment of error in all its parts is without merit.
 D
In assignment of error four appellant alleges the trial court judge was biased against appellant and deprived appellant of a fair trial. Specifically appellant points to statements made by the trial judge at the sentencing hearing, after the jury's recommendation of a death sentence; the jury selection process; the judge's distinction between "innocent and presumed innocent"; and the judge's overrulings on objections to the prosecutor.
Comments made by the trial judge after the jury sentencing recommendation had no effect on the jurors' deliberation process and could not have affected appellant's right to a fair trial. There is no statute or case law which indicates that it is improper for a judge to form an opinion as to the guilt or innocence of an individual being tried so long as that judge does not express that opinion to the jury prior to the conclusion of the jurors' duties.
Appellant's allegation that he was denied meaningful voir dire by the trial court judge has been addressed in assignment of error one and found to be without merit. Appellant again argues that the trial court improperly used the jury selection standard during voir dire ofWainwright, supra as opposed to that standard outlined in Morgan v.Illinois (1992), 504 U.S. 719. As stated in assignment of error one, citing Johnson, supra, the proper standard for the voir dire of a prospective juror is that of Witt, supra and the trial judge properly conducted the jury voir dire and a fair and impartial jury was selected.
During voir dire of the jury panel, appellant's counsel, while addressing the panel members, made the following statements:
 "The first thing that I would like to discuss is the burden of going forward with the evidence. In this country an individual is innocent until proven guilty. It is guaranteed by our Constitution, and the State of Ohio freely and readily accepts that burden day in and day out.
 "THE COURT: There again, I am going to interrupt when I think or see fit. That's not the law. He is not innocent; he is presumed innocent.
"ATTY. HARTFORD: Presumed innocent.
"THE COURT: And there's a big difference.
 "ATTY. HARTFORD: Yeah. Presumed innocent until proven guilty."
(Tr. 1129).
R.C. 2901.05 which defines the presumption of innocence and burdens of production of evidence states in relevant:
 "(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused."
The trial court judge's correction of appellant's counsel was not prejudicial and comports with the statutory definition on this issue.
Appellant next argues that the trial court was biased in the court's handling of the admission of some of the state's exhibits. Specifically, appellant alleges that the judge displayed bias toward the appellant in the manner in which the judge overruled his objection to the admission of the business records of Locke Jewelry Store where appellant purchased and twice had resized a wedding ring. The following transpired between the trial court and appellant's counsel:
 "MR. HERRON: Your Honor, at this time, the State would move for the admission of what's been marked as Exhibits — State's Exhibits Number 125 through 130 inclusive. They are business records of Locke Jewelry.
"THE COURT: Any objection?
 "MR. STACEY: One second, Your Honor. Your Honor, we would object to the admission of those proposed exhibits on the basis of number one, those exhibits were listed on supplement to discovery filed March 20, 1995, one week prior to trial in this matter, and during the course of this, we had requested that these documents be made available to us, and the defense was not provided with the documents that have been proposed for admission into evidence. We were provided with, on a certain date, K-Mart employment records, dated March 20th — or filed on that supplement to discovery of March 20, 1995; we were provided with some photographs of Lynn Hanna, a photograph of the van, a photograph of rings, everything else that's on this list, and we also asked for all of those specific records, but were not provided those records by the prosecution in this case.
 "THE COURT: Did you bother to go down to James Locke Jewelers and ask them if they had them?
"MR. STACEY: Did we —
 "THE COURT: I withdraw that statement. State's exhibit 125 may be admitted; 126 may be admitted; 127 may be admitted; 128 may be admitted; 129 may be admitted; and 130 may be admitted."
(Tr. 3484-3485).
Clearly these exhibits were admissible as business records and the trial court did not demonstrate any bias against the appellant.
 E
In assignment of error five appellant argues that Ohio's capital laws, as enacted and interpreted, deny a capital defendant meaningful appellate review. Specifically, appellant alleges that because jurors are not instructed to consider mercy that Ohio's capital laws place an improper limit upon mitigation evidence and deny him of an effective mitigation argument. Next, appellant argues that the proportionality analysis required in capital cases is not properly applied in these cases. Finally, appellant alleges that Ohio courts permit inadequate independent weighing of aggravating circumstances and mitigating factors including the use of non-statutory aggravating circumstances.
In State v. Poindexter (1988), 36 Ohio St.3d 1, 3, the Ohio Supreme Court specifically granted appellate courts the authority to summarily dispose of issues of law which have previously been decided by it in capital cases. Nonetheless, this court shall address each constitutional challenge and delineate the authority which renders each issue meritless.
While appellant's arguments in this assignment of error are long and involved, it must be noted that there is nothing which points to the record in this case to demonstrate any error by the trial court.
In this assignment of error, the appellant alleges the trial court erred in refusing a "mercy" instruction, as a mitigating factor during the penalty phase of the trial. This issue has been settled by the Ohio Supreme Court in State v. Lorraine (1993), 66 Ohio St.3d 414, 417-418, where the court stated:
 "Appellant in his second proposition of law contends that he was denied a fair trial because the trial court refused to instruct the jury concerning mercy and prohibited him from asking the jury to err on the side of mercy.
"This court has previously considered a similar issues. We held in Statev. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus:
 "`The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guidelines fixed by statute as opposed to the individual juror's personal biases or sympathies.'
"* * *
 "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. Brown, supra, at 541, 107 S.Ct. At 839, 93 L.Ed.2d at 939; Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.
 "R.C. 2929.03(D)(2) provides that `[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.' (Emphasis added.) This statutory requirement eliminates the subjective state of mind the issue of mercy generally adds to a jury's deliberation.
 "Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors. Appellant's counsel therefore was not allowed to plead for mercy, although he was permitted to plead for appellant's life based upon the statutory mitigating factors.
Accordingly, this proposition is not well taken."
It is not within this court's purview to reverse a decision of the Ohio State Supreme Court on an issue such as has been raised by appellant. Thus, this court will follow the decision in Lorraine and find this issue to be without merit. See also State v. Vrabel (March 2, 2000), Mahoning App. No. 95 C.A. 221, unreported, and State v. Gerish (April 22, 1999), Mahoning App. No. 92 C.A. 85, unreported.
Appellant's arguments concerning the lack of an adequate proportionality review by the appellate and Supreme Courts of Ohio is also without merit. (See assignment of error nine).
Finally, appellant here argues that the Ohio courts permit inadequate independent weighing of aggravating circumstances and mitigating factors including the use of nonstatutory aggravating circumstances. Nowhere in appellant's brief does he indicate any specific instances of these alleged inadequacies in the instant case.
R.C. 2925.05 (as it existed at the time of the offense in this case) relates to this court's independent review of the aggravating circumstances and the mitigating factors to be applied in our review of the case.
 "The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case."
The Ohio Supreme Court in State v. Holloway (1988), 38 Ohio St.3d 239,245, stated:
 "We find that the independent weighing process at each appellate level required by R.C. 2929.05 does not contravene the role of the jury in the penalty proceeding; rather, the statutory scheme provides a procedural safeguard against the arbitrary imposition of the death penalty. Moreover, three opportunities are provided defendants to argue the appropriateness of a sentence less than death to courts which must decide the question de novo. * * *
"Accordingly, we hold that the independent appellate review of the sentencing decision in a capital case does not violate either the Ohio or the United States Constitutions."
 See also State v. Vrabel (March 2, 2000), Mahoning App. No. 95 C.A. 221, unreported.
For all the reasons cited above this assignment of error is without merit in all its parts, and the trial court was correct in its denial of appellant's Motion to Dismiss, Motion to Elect Between Two Death Penalty Specifications, and the Motion to Dismiss Death Penalty Specifications.
 F
In assignment of error six appellant alleges the trial court did not conduct or permit a reasonable investigation into alleged juror misconduct. Specifically, appellant argues that he should have been allowed to question the juror and that the trial court judge's questioning was insufficient.
After the guilt phase of the trial and just before the penalty phase began, appellant filed an affidavit and produced the testimony of appellant's brother, Russell Reynolds. Reynolds said that he had over the preceding weekend been in a restaurant where he heard a person he recognized to be a juror talking about the case. The juror was identified to be Paul Repasky, who acknowledged being in the restaurant and who acknowledged being approached by Reynolds. The juror, however, said that he and his three companions were talking about the O.J. Simpson case and the Oklahoma City bombing case.
The trial court then questioned juror Paul Repasky under oath as to whether he had discussed the case at a restaurant during the trial.
"Q Now, you're Paul Repasky?
"A Yes, sir.
"Q And you live where, Paul?
"A In Unity.
 "Q Sunday did you have occasion to go to — in the afternoon, go to what's the name of the place?
"MR. HERRON: Pie Factory.
"Q (By the Court) Pie Factory.
"A Yes, sir.
 "Q And while you were in the Pie Factory, were you approached to someone with reference to this case?
 "A Well, I guess they must have knew about the case, but they came — approached me.
"Q Who's they? One or two people?
"A One person.
"Q Have you seen him here in the courtroom before?
"A Yeah, I have.
"Q Do you see him out there now?
"A No, I don't see him there today.
 "THE COURT: Would you bring that witness and have him stand right in the middle.
 "(At this time, Mr. Russell Reynolds was brought back to the courtroom.)
 "Q (By the Court) While we're waiting, Paul, were you there with other people?
"A Yeah, I was there with three other people.
"Q And they were who?
 "A Dave Johnson and his wife, Carol Johnson; and Sophie Grubb.
"Q Okay. Did you talk about this case?
"A No.
"Q I beg your pardon?
"A No, sir.
"Q Not in any way?
 "A No, they might have mentioned something where he come over there and wrapped me on the shoulder and said, `Are you talking about this case?' I said, `No, we're talking about OJ and the Oklahoma deal.'
"Q What did this person say to you?
 "A He said, `Are you talking about the Reynolds case?'
"Q And what did you say?
"A And I said, `No way.'
 "Q And you were talking about what? You told him you were talking about what?
"A OJ's case.
"Q And the Oklahoma case.
"A Yeah.
"Q Were you talking about this case?
"A Not I.
"Q Is that the person you say —
"A At the Pie Factory, yes, sir.
 "THE COURT: Okay, thank you. You may step out. You may retire to the jury room.
"(At this time, the juror was excused from the courtroom.)
 "THE COURT: I am not going to replace this Juror. I believe him. I don't believe Mr. Reynolds. Bring the Jury in."
(Tr. 3899-3902).
In the following case of State v. Rudge (1993), 89 Ohio App.3d 429,442, a review of a court's responsibilities upon an allegation of juror misconduct is undertaken:
 "`The sixth amendment right to trial by jury is designed to ensure criminal defendants a fair trial by a "panel of impartial, `indifferent' jurors." Irwin v. Down, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 [755] (1961). When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the sixth amendment. See, e.g., United States v. Griffith, 756 F.2d 1244, 1252 (6th Cir. 1985); United States v. Pennell, 737 F.2d 521, 532-33 (6th Cir. 1984), cert. Denied, [469] U.S. [1158], 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); United States v. Corbin, 590 F.2d 398, 400
(1st Cir. 1979). Since the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion. See, e.g. United States v. Soulard, 730 F.2d 1292, 1305 (9th Cir. 1984); United States v. Halbert, 712 F.2d 388, 389 (9th Cir. 1983), cert. Denied, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); United States v. Chiantese, 582 F.2d 974, 978-79 (5th Cir. 1978); United States v. Hendrix, 549 F.2d 1225, 1227-29 and n. 2 (9th Cir. 1977).' United States v. Shackelford
(C.A.6 1985), 777 F.2d 1141, 1145."
In our case the trial court judge, after questioning the juror under oath, believed that the juror was not discussing the case, while disbelieving the appellant's brother. The trial judge investigated the allegation and did not find any violation by the juror. The trial judge was in the best position to evaluate both witnesses and to make an informed decision in the matter. The trial court's ruling on this issue can only be reviewed upon an abuse of discretion standard. The term "abuse of discretion" connotes more than an error of law or judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the court. See State v. Adams (1980), 62 Ohio St.2d 151.
This assignment of error is without merit.
 G
In assignment of error seven, appellant alleges that the trial court erred in the admission of certain photo exhibits in both the guilt and penalty phases of the trial. Appellant argues that the photographs were cumulative and so gruesome so as to inflame the passions of the jury, denying appellant of a fair trial.
Evid.R. 403 covers the admissibility of evidence. Rule 403 provides:
"(A) Exclusion mandatory
 "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
"(B) Exclusion discretionary
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."
In State v. Morales (1987), 32 Ohio St.3d 252, 257, the Ohio State Supreme Court sets out the standard to be applied for the admissibility of photographic evidence in capital cases. In Morales the court stated:
 "When considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant. See State v. Tingler
(1972), 31 Ohio St.2d 100, 103-104, 60 O.O.2d 81, 83-84, 285 N.E.2d 710, 713; State v. Rahman (1986), 23 Ohio St.3d 146, 152, 23 OBR 315, 320, 492 N.E.2d 401, 407. The admission or exclusion of such photographic evidence is left to the discretion of the trial court. State v. Hill (1967), 12 Ohio St.2d 88, 41 O.O.2d 369, 232 N.E.2d 394, paragraph two of the syllabus; State v. Wilson (1972), 30 Ohio St.2d 199, 203-204, 59 O.O.2d 220, 222, 284 N.E.2d 632; State v. Tingler, supra. Accordingly, a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence. Absent such danger, the photograph is admissible.
"However, in capital cases, this court has, in State v. Maurer (1984),15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, set forth a stricter evidentiary standard for the introduction of photographs. In Maurer,supra, this court held in paragraph seven of the syllabus that:
"`Properly authenticated photographs, even if gruesome, are admissible in a capital prosection if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to adefendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.' (Emphasis added.)
"Thus, the emphasis that a trial judge must apply in meeting an Evid.R. 403 objection has changed in capital cases. To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature. Contrary to the Evid.R. 403 standard, where the probative value must be minimal and the prejudice great before the evidence may be excluded, pursuant to Maurer, supra, if the probative value does not, in a simple balancing of the relative values, outweigh the danger of prejudice to the defendant, the evidence must be excluded. See the insightful discussion of Professor John W. Palmer in his Ohio Rules of Evidence Desk Manual (1986), at 169. See, also, State v. Mann
(1985), 19 Ohio St.3d 34, 38, 19 OB R 28, 32, 482 N.E.2d 592, 597; Statev. Martin (1985), 19 Ohio St.3d 122, 129, 19 OBR 330, 336, 483 N.E.2d 1157,1164; and State v. Williams (1986), 23 Ohio St.3d 16, 19, 23 OBR 11, 16,490 N.E.2d 906, 910."
In our case quite a few of the photographs deemed admissible were gruesome. The fact that photographs are gruesome do not make them inadmissible. In the case of State v. Woodards (1966), 6 Ohio St.2d 14, the court stated in part:
 "Although a photograph may be rendered inadmissible by its inflammatory nature, the mere fact that it is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury. People v. Brubaker, 53 Cal.2d 37, 346 P.2d 8; People v. Jenko, 410 Ill. 478, 102 N.E.2d 783; Commonwealth v. Novak, 395 Pa. 199, 150 A.2d 102.
"The real question is whether the probative value of such photographs is outweighed by the danger of prejudice to the defendant. See Wisniewskiv. State, 51 Del. 84, 138 A.2d 333. But see People v. Jackson,9 Ill.2d 484, 138 N.E.2d 528; Kiefer v. State, 239 Ind. 103,153 N.E.2d 899."
See also State v. Maurer (1989), 15 Ohio St.3d 239.
In our case appellant points out four photographs as being cumulative and gruesome. Appellant cites State's Exhibits 52, 53, 57, 58, and 59 as those photos which were admitted into evidence which was only to "inflame the passions of the jury."
Exhibit 52 was a photo of the upper torso of the dismembered body. Testimony concerning this photo related to how the body was dismembered and to what type of implements would have been used in the dissection of the body. (Tr. 264). Exhibit 53 was a photo of the chest wall showing a small hole which was described as a bullet wound through the chest and rib. (Tr. 2654). Exhibit 57 was a photo showing portions of the human body aligned in anatomically correct order and used to compare an abdominal scar with prior medical records, thus used for the subsequent identification of Lynn Hanna as the victim. (Tr. 2693). Exhibit 58 was a photo showing the body parts with the gunshot injury and testimony related to the cause of death. (Tr. 2710). Exhibit 59 was a photo of a left arm and torso. The testimony on this exhibit related to how the body was dismembered, that the gunshot occurred while the victim was alive, and that the lung with the bullet had been intentionally removed from the body. (Tr. 2715).
All of the photo exhibits questioned by the appellant were relevant to the case and although gruesome, had probative value, and were related to the elements of the crime charged.
There were extensive photographic exhibits introduced and admitted into evidence in this case. Many were needed and used to prove the identity of the victim as being that of Lynn Hanna. Many other photos were used to establish the cause of death in this case. Also, many photos were introduced to show how the body was dissected. This information related directly to the evidence against the appellant.
The gruesome photographs admitted into evidence in this trial, while very numerous, were neither repetitive nor cumulative. Also, the probative value, due to the unique nature of the proof required in this case, substantially outweigh the danger of unfair prejudice to the appellant, thereby satisfying the standard of Maurer, supra. Also, Evid.R. 403 has been satisfied since the probative value of the photographs was not substantially outweighed by their prejudicial effect.
Note also that under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. See Statev. Wilson (1972), 30 Ohio St.2d 199.
This assignment of error is without merit.
 H
In assignment of error eight the appellant argues that the trial court erred in overruling his motion for discovery sanctions against the prosecutor. Specifically appellant takes exception to the court's admission of the exhibits from Locke Jewelers after the following transpired during trial:
 "MR. HERRON: Your Honor, at this time, the State would move for the admission of what's been marked as Exhibits — State's Exhibits Number 125 through 130 inclusive. They are business records of Locke Jewelry.
"THE COURT: Any objection?
 "MR. STACEY: One second, Your Honor. Your Honor, we would object to the admission of those proposed exhibits on the basis of number one, those exhibits were listed on supplement to discovery filed March 20, 1995, one week prior to trial in this matter, and during the course of this, we had requested that these documents be made available to us, and the defense was not provided with the documents that have been proposed for admission into evidence. We were provided with, on a certain date, K-Mart employment records, dated March 20th — or filed on that supplement to discovery of March 20, 1995; we were provided with some photographs of Lynn Hanna, a photograph of the van, a photograph of rings, everything else that's on this list, and we also asked for all of those specific records, but were not provided those records by the prosecution in this case.
 "THE COURT: Did you bother to go down to James Locke Jewelers and ask them if they had them?
"MR. STACEY: Did we —
 "THE COURT: I withdraw that statement. State's Exhibit 125 may be admitted; 126 may be admitted; 127 may be admitted; 128 may be admitted; 129 may be admitted; and 130 may be admitted.
 "(At this time, State's Exhibits 125, 126, 127, 128, 129, and 130 were admitted into evidence.)" (Tr. 3484).
Crim.R. 16 governs discovery, and states in relevant part:
 "(B) Disclosure of evidence by the prosecuting attorney.
"(1) Information subject to disclosure.
 "(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney.
 "(i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof;
 "(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer;
 "(iii) Recorded testimony of the defendant or co-defendant before a grand jury."
 "(b) Defendant's prior record. Upon motion of the defendant the court shall order the prosecuting attorney to furnish defendant a copy of defendant's prior criminal record, which is available to or within the possession, custody or control of the state.
 "(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
"* * *
"(E) Regulation of discovery.
 "(1) Protective orders. Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred, or make such other order as is appropriate. Upon motion by a party the court may permit a party to make such showing, or part of such showing, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such a showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.
 "(2) Time, place and manner of discovery and inspection. An order of the court granting relief under this rule shall specify the time, place and manner of making the discovery and inspection permitted, and may prescribe such terms and conditions as are just.
 "(3) Failure to comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
A review of the record in this case does not indicate that the appellant was denied access to the records in question. Crim.R. 16(B)(1) provides in part, that, "The court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available * * * documents * * *."
Appellant, in his objection to the admission of these records stated, "* * * the defense was not provided with the documents that have been proposed for admission into evidence." (Tr. 3484). Appellant admitted that these documents were listed in a supplement to discovery one week prior to trial. There is no evidence that appellant's counsel made any attempt to inspect these documents prior to trial and the prosecutor was not under any duty to provide the original documents, without a request from the appellant.
Also in determining whether the prosecutor improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceedings would have been different; a reasonable probability is one sufficient to undermine confidence in the outcome. See State v. Wickline (1990), 50 Ohio St.3d 114.
In this case the prosecutor did not improperly suppress evidence. Clearly this evidence was admissible, and there is no evidence that had the appellant's counsel reviewed these documents prior to trial that the results of the proceedings would have been different.
Granting or overruling of various discovery motions in a criminal case rests within the sound discretion of the trial court, and only in cases of clear abuse will that discretion be disturbed on appeal. State v.Shoop (1993), 87 Ohio App.3d 462.
This assignment of error is without merit.
 I
In assignment of error nine appellant argues that the trial court erred in failing to dismiss the death specifications and in imposing the death sentence. The appellant alleges that the proportionality review was not meaningful.
Specifically, appellant alleges that Ohio's proportionality reviews are not sufficiently conducted since the courts only compare cases in which death has been imposed with other cases in which death has been imposed, ignoring those instances in which the death sentence could have been imposed and was not imposed by the trial court. Appellant also argues that it is error to only compare death sentence facts with other death sentences within the sentencing appellate district.
Appellant goes on to argue that R.C. 2929.03 fails to require that a jury provide any factual basis for their decisions for the appellate courts to distinguish between cases in which death is imposed and those in which death is not imposed. Here appellant argues that R.C. 2929.03
should require a jury when recommending life imprisonment to specify the mitigating factors it found for its decision in order to provide the appellate courts with sufficient data on jury rationale for choosing a life sentence over a death sentence.
Appellant also alleges that meaningful proportionality review is lacking when there is no informational data on how many aggravated murder cases are indicted as capital murder.
Under this assignment of error, as has been presented in other cases before this court, appellant presents a comprehensive historical discussion of the death penalty in the United States. This historical survey concludes with appellant's analysis of the 1972 United States Supreme Court decision of Furman v. Georgia (1972), 408 U.S. 238, where the Court struck down virtually all death penalty schemes because there was no principled way to distinguish cases in which it was imposed and those in which it was not imposed.
This court notes that appellant's entire assignment of error seem to rest upon the premise that a proportionality review is constitutionally mandated when a sentence of death is imposed. This simply is not the law. As the United States Supreme Court noted:
 "That some schemes providing proportionality review are constitutional does not mean that such review is indispensable * * * Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement." Pulley v. Harris (1984), 79 L.Ed.2d 29, 37.
Since a proportionality review is not constitutionally required, Ohio is free to define the scope of any proportionality review that is adopted. State v. Bedford (1988), 39 Ohio St.3d 122. The proportionality review that has been employed as part of Ohio's overall death penalty system is codified in R.C. 2929.05. The purpose behind the proportionality review is to ensure that the sentencing authorities do not impose the death penalty in a capricious or arbitrary fashion. State v.Jenkins (1984), 15 Ohio St.3d 164, 176.
Appellant alleges that the trial court erred in failing to dismiss the death specifications, and in imposing the death sentence for the death of Lynn Hanna, since Ohio's capital law does not conduct a meaningful proportionality review in that it does not require data on juror's rationale for choosing life sentences over death penalties and it only requires a reviewing court to compare death sentences with other death sentences, and the jury is not required to articulate its methods and reasoning for determining that the aggravated circumstances outweigh the mitigating factors.
Appellant's argument that Ohio's capital murder laws are inadequate in that they do not require a jury when recommending a life sentence over a death sentence to identify the mitigating factors is without merit.
This issue was addressed and disposed of in State v. Jenkins (1984),15 Ohio St.3d 164, 174-177, where the Ohio Supreme Court stated:
 "In his next contention appellant focuses upon the requirements of R.C. 2929.021, 2929.03 and 2929.05, arguing that the extent of proportionality review in Ohio is constitutionally infirm. In the main, appellant contends that proportionality review in Ohio is flawed since there is no requirement for a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances.
"We first observe that appellant's argument that proportionality review is constitutionally required is without merit.
"In Pulley v. Harris (1984), ____U.S. ___, 79 L.2d 2d 29, the Supreme Court held that neither Gregg, Proffit nor Jurek established proportionality review as a constitutional requirement. Id. At 39.
"Thus, although reviewed as commendable, the decision in Pulley
demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors into Ohio's death penalty statutes, as well as providing proportionality review — a meaningful function which reduces the arbitrary and capricious imposition of death sentences.
"The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.
"The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-Furman era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. SeeGregg at 204-206, and Proffit at 259-260.
"The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to all capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. See R.C. 2929.021, supra at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct."
Appellant's argument that there is a flaw in the proportionality review in Ohio since the court is only required to review cases in which the death penalty was imposed and not other cases where the death penalty might have been imposed has previously been addressed by this court inHudson, supra, and found to be without merit. See, also State v. TwyfordIII (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported; Eley,supra; State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28, unreported; and State v. Gerish (Apr. 22, 1999), Mahoning App. No. 92 C.A. 85, unreported.
It is appellant's belief that additional data is required for there to be a constitutionally adequate comparison of death penalty cases. This argument focuses upon what is viewed as a lack of information to perform a meaningful review and comparison.
The death penalty statute's proportionality review provision is not unconstitutional when the court reviews only cases where the death penalty was sought. Review need not encompass cases where the death penalty was not sought but could have been sought. See State v. Green
(1993), 66 Ohio St.3d 141. Also, the proportionality review mandated by R.C. 2929.05(A) does not require a review of those cases in which a sentence of life imprisonment is imposed rather than the death sentence. See State v. Davis (1992), 63 Ohio St.3d 44. It is also clear that proportionality review is restricted to those cases already decided by the reviewing court in which the death penalty has been imposed. See Statev. Steffen (1987), 31 Ohio St.3d 111. Furthermore, the Ohio Supreme Court has previously determined on numerous occasions that the scheme established to review and compare death penalty cases is sufficient and constitutional. State v. Moore (1998), 81 Ohio St.3d 22, 39; State v.Davie (1997), 80 Ohio St.3d 311, 328; State v. Benner (1988),40 Ohio St.3d 301, 318. Accordingly, this argument is meritless.
This assignment of error is without merit.
 J
In assignment of error ten appellant argues that the trial court was in error in permitting the introduction of hearsay evidence in his trial. The evidence which the appellant alleges as hearsay are several statements made by the victim Lynn Hanna, that she and the appellant were going to burn the Stagecoach Rd. property belonging to Lynn Hanna for the insurance settlement. Appellant argues that these statements were out of court statements, offered to prove the truth of the assertions in the statement, therefore constitute hearsay, and that none of the hearsay exceptions apply.
Evid.R. 801 provides the definition of hearsay as:
"RULE 801. Definitions
"The following definitions apply under this article:
 "(A) Statement. A `statement' is (1) oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
"(B) Declarant. A `declarant' is a person who makes a statement.
 "(C) Hearsay. `Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
Evid.R. 804 provides the definitions of hearsay exceptions and states, in relevant part:
"RULE 804. Hearsay Exceptions; Declarant Unavailable
 "(A) Definition of unavailability. `Unavailability as a witness' includes situations in which the declarant:
"* * *
 "(4) is unable to be present or to testify at the hearing because of death or then-existing physical or mental illness or infirmity; or
"* * *
 "(B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
"* * *
 "(3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
From the above it is clear that Lynn Hanna was "unavailable" as defined in the statute and the content of her statement fulfills the definition of a "statement against interest" as defined in Evid.R. 804(B)(3), which makes the admission of these statements admissible under the exceptions to the hearsay rule.
Also, when Melissa Thayer was testifying concerning her mother's statements about committing arson with the appellant, there was no objection made by the appellant. (Tr. 1894).
A decision whether to admit hearsay statements of an unavailable declarant as a statement against interest is within the sound discretion of the trial court. See State v. Sumlin (1994), 69 Ohio St.3d 105.
For all the reasons cited above, this assignment of error is without merit.
 K
In assignment of error eleven, appellant alleges the trial court erred in failing to dismiss the death penalty because the irrevocable nature of the penalty makes it impossible to cure any possible errors, including the possibility of innocence. Appellant goes on to cite various examples where convicted murderers on "death row" were later found to be not guilty of the crimes charged.
The facts in this case do not lead to a reasonable finding that appellant is innocent of the murder of Lynn Hanna.
First we have dual testimony concerning the joint arson which was planned by Lynn Hanna and the appellant, and the later suspect fire which occurred. There was testimony concerning a disagreement between the victim and appellant as recent as three days before her disappearance whereby he knocked her down, kicked her, and choked Lynn Hanna.
The record contains evidence that appellant requested a friend to provide him an alibi for a specific period of time. The record reflects the transferral of the victim's real estate and trailer by the appellant, to the appellant, just after Lynn Hanna disappeared. We are also presented with testimony of the distribution of Lynn Hanna's personal effects by appellant just after her disappearance.
The record contains testimony concerning the purchase of a meat saw of the type used in butchering by the appellant, just before Lynn Hanna disappeared. It includes testimony concerning the appellant's almost professional ability to butcher deer. Further, there was testimony, upon the discovery of the dismembered body of Lynn Hanna, concerning the manner in which the body was dissected.
About the time the body would have been deposited in the Ohio River, the record contains testimony as to the discovery of a nervous appellant by a West Virginia Deputy Sheriff at a location near where the body parts could have been placed in the river.
We are also presented with evidence that the appellant took Lynn Hanna's ring to be resized for him, along with testimony that the recovered body appeared to have had a ring removed from her hand.
Finally, and most importantly, we are presented with testimony by appellant's son and his friend that the appellant told them that he killed Lynn Hanna to prevent her from turning him in for the arson.
The Ohio Supreme Court has addressed the issue regarding the death penalty and its concern for the rights of those individuals accused of committing these crimes. In the case of State v. Steffen (1994),70 Ohio St.3d 399, at 407, it stated:
 "Herein lies the internal conflict that death row inmates have seized upon and used to their advantage. We, as a society, are justifiably tentative about imposing death as a punishment for crimes. Having assumed the power to take life, we have striven for a level of assurance in our decisions that is probably not humanly possible. We have created a web of procedures so involved that they threaten to engulf the penalty itself. We arrive at a point, however, where greater certitude is not reasonably possible. There comes a time where the possibility that something else can be discovered approaches the vanishing point. Then we must end our inquiry and act upon the conclusion we have reached. Procrastination will not satisfy the soul."
For all the reasons cited above, this assignment of error is also without merit.
 L
In assignment of error twelve, appellant alleges that death by electrocution or by lethal injection are both cruel and unusual punishment in that they are disproportionate, excessive and a needless imposition of pain and suffering. Appellant goes on to assert that evolving standards of decency require the barring of electrocution as unnecessary and wanton infliction of pain, extensively citing various instances involving supposed execution "foul-ups."
Ohio law allows appellant to choose death by lethal injection over electrocution by written request filed no later than one week prior to his scheduled execution date. Thus, appellant has an option of not being put to death by electrocution.
In any event, the Ohio Supreme Court has repeatedly held that the death penalty scheme is constitutional as that manner of imposing death does not constitute cruel and unusual punishment. See State v. Coleman (1989),45 Ohio St.3d 298.
 "The death penalty by means of electrocution is not cruel and unusual punishment. State v. Brooks (1986), 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407; State v. Buell (1986), 22 Ohio St.3d 124 and State v. Jenkins, supra."
See also, State v. Bayless (1976), 48 Ohio St.2d 73 (holding that the sentence of death by electrocution, for the crime of aggravated murder, does not violate the prohibition of the United States Constitution against cruel and unusual punishment.)
This assignment of error is without merit.
 M
In assignment of error thirteen appellant argues that the trial court erred in failing to dismiss the death penalty specifications because the Ohio death penalty violates the Ohio Constitution. Appellant alleges that separate analysis of the death penalty under Sections 1, 2, 5, 9, 10 and16, Article I, Ohio Constitution is required because the analysis is not the same as for the Federal Constitution.
In assignment of error thirteen, appellant alleges the trial court erred in failing to dismiss the death specification since Ohio's death penalty law involves an excessive and imprecise use of government powers so as to encroach upon Section 1, Article I, Ohio Constitution, the "inalienable" liberties clause of the Ohio Constitution.
Appellant proposes that the Ohio state courts are free to construe its constitution as providing broader individual liberties than those provided under the federal constitution. Appellant urges this court to provide greater protection for this defendant than has previously been granted by this court and the Ohio Supreme Court to other death penalty defendants.
At one point, appellant alleges that the use of a death-qualified jury (i.e. one jury to determine both guilt and penalty) violates his right to a fair and impartial jury, as well as his right to effective assistance of counsel. Next, appellant alleges that the death penalty is "cruel and unusual" punishment in that it is not predictably and reliably imposed, not the least restrictive method, and inflicts unwarranted pain and suffering. Finally, appellant alleges that to "death quality" a jury denies a defendant of due process.
Appellant's point concerning the use of a death qualified jury was addressed and found to be without merit in assignment of error one and also was addressed and rejected by the Ohio Supreme Court in State v.Mapes (1985), 19 Ohio St.3d 108, 116-117, where the court reasoned, in part:
 "Appellant also argues that the use of the same jury at the guilt and penalty phases of his trial violated his right to trial by a fair and impartial jury and his right to effective assistance of counsel. Appellant argues that the jury did not fairly and impartially view him during the penalty phase because it had convicted him during the guilt phase and that appellant's counsel was not effective during the penalty phase for the same reason. These arguments were also rejected in State v. Jenkins where we stated:
"`Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, seeZant v. Stephens, * * * [(1983), ___ U.S. ___, 77 L.Ed.2d 23] at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.'"
Thus, the Ohio Supreme Court has rejected the premise that the constitution requires a new jury be selected for the sentencing phase of the trial. See, also, State v. Maurer (1984), 15 Ohio St.3d 239. We therefore similarly hold that appellant is not denied effective assistance of counsel when counsel is required to talk about the death penalty during voir dire. As was found in Jenkins, Maurer and Mapes,supra, Ohio courts have not been swayed by the argument that a jury will view counsel as less credible in the event he is forced to present both the guilt and the sentencing phase to one jury or is required to discuss the death penalty prior to the presentation of any evidence.
Appellant's next allegation that the death penalty is not the "least restrictive" and "cruel and unusual" punishment under Section 1, ArticleI, Ohio Constitution has been addressed in assignment of error twelve and found to be without merit and also again by the Ohio Supreme Court inJenkins, supra, where that court stated:
 "Appellant's `least restrictive' argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in Gregg v. Georgia (1976), 428 U.S. 153; Proffit v. Florida
(1976), 428 U.S. 242; Jurek v. Texas (1976), 428 U.S. 262; Woodson v. North Carolina (1976), 428 U.S. 280; and Roberts v. Louisiana (1976), 428 U.S. 325.
"In Gregg, supra, the court stated that `* * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' The Supreme Court stated that the death penalty `* * * is an extreme sanction, suitable to the most extreme of crimes.' Appellant's argument is predicated upon societal protection, while the Supreme Court has recognized that the death penalty, as a sanction or punishment is proper in extreme cases.
"Alternatively, appellant argues that the death penalty violates the prohibition under the Eighth Amendment against cruel and unusual punishment and is therefore per se unconstitutional. We disagree. Clearly, any vitality which this argument may have had at the time ofFurman v. Georgia (1972), 408 U.S. 238, was rejected in Gregg and its companion cases when the high court stated:
"`We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.'
"Moreover, since the decision in Gregg, the recurring theme has been that states may constitutionally impose the sentence of death as long as the discretion of the sentencing authority is `suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' in imposing the sentence. Zant v. Stephens (1983), ___ U.S. ___,77 L.Ed.2d 235, at 248. The Supreme Court has stressed the necessity of `genuinely narrow[ing] the class of persons eligible for the death penalty,' id. at 249, while requiring the capital sentencing procedure guide and focus `the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.' Jurek, supra, at 273-274. With these principles in mind, appellant's argument, which requests the erection of aper se rule against the death penalty, must be rejected."
Appellant's argument that to "death qualify" a jury denies a defendant of due process is also without merit. This issue was also fully addressed and rejected by the Ohio Supreme Court in State v. Mapes (1985),19 Ohio St.3d 108, where the court reasoned:
 "R.C. 2945.25(C) permits challenge for cause in a capital case if a venireman `unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.' This statute finds its origin in Witherspoon v. Illinois
(1968), 391 U.S. 510, wherein the Supreme Court stated that prospective jurors may be excluded for cause when it is unmistakably clear that they will automatically vote against the death penalty without regard to the evidence or that their attitudes toward the death penalty will prevent them from making an impartial decision. Appellant argues that the process of `death-qualifying' jurors that sit for the guilt phase of a capital trial violates the rights of equal protection and due process because such jurors are not representative of a fair cross-section of the community and are conviction prone.
"This argument was addressed in State v. Jenkins, supra, in which we note that * * * `death-qualify[ing] a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury.' This holding controls the issue as raised in this case."
Appellant's contention that death-qualifying jurors denies him an impartial jury composed of a fair cross-section of the community can also be disposed of by looking to Jenkins and Maurer, supra. The Ohio Supreme Court has previously held that "[t]o death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury." Maurer, supra, at 224.
As noted by the appellee, the Ohio Supreme Court in the case ofBenjamin v. Columbus (1957), 167 Ohio St. 103 articulated principles established by its precedents interpreting Ohio's Constitution, and stated:
 "Almost every exercise of the police power will necessarily either interfere with the enjoyment of liberty or the acquisition, possession and production of property, within the meaning of Section 1 of Article I of the Ohio Constitution, or involve an injury to a person within the meaning of Section 16 of Article I of that Constitution, or deprive a person of property within the meaning of Section 1 of Article XIV of the Amendments to the Constitution of the United States. Nevertheless, it is well settled that an exercise of the police power having such an effect will be valid if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and if it is not unreasonable or arbitrary. City of Piqua v. Zimmerlin, 35 Ohio St., 507, 511.
"Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body, and, unless the decisions of such legislative body on those questions appear to be clearly erroneous, the courts will not invalidate them. State, ex rel. Standard Oil Co., v. Combs, Dir.,129 Ohio St., 251, 194 N.E., 875; City of Dayton v. S.S. Kresge Co.,114 Ohio St., 624, 151 N.E., 775, 53 A.L.R., 916; and City of Cleveland v.Terrill, 149 Ohio St., 532, 80 N.E.2d 115."
The legislature of Ohio has set forth the law in Ohio for the imposition of capital punishment, looking at the public safety and general welfare of the public. The Ohio State Supreme Court in ruling on these laws have found them to be constitutional under both the Federal Constitution and the Ohio Constitution. In the case of State v. Maurer
(1984), 15 Ohio St.3d 239, the Court stated:
 "1. Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth
and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution. (State v. Jenkins, 15 Ohio St.3d 164, paragraph one of the syllabus, followed.)"
For all the reasons cited above this court does not choose to hold Ohio courts to a higher standard than has been imposed by the United States Supreme Court and Ohio Supreme Court.
This assignment of error is without merit.
 N
In assignment of error fourteen appellant alleges the trial court erred when it denied appellant's motion for a change of venue.
Under his fourteenth assignment of error, appellant contends that his motion for a change of venue should have been granted because the extent of media coverage had been so great that the trial court should have presumed that a fair and impartial jury could not be seated. Appellant does not point to any specific juror who was seated in his trial as being partial and unfair to appellant. Appellant alleges that the entire jury venire was so exposed to the publicity surrounding this case that a showing of identifiable prejudice was not required due to the likelihood of prejudice. It also must be noted again that appellant's counsel did not utilize all of his twelve peremptory challenges in his juror selection.
As part of his constitutional right to a fair trial, a criminal defendant is entitled to be tried by a panel of impartial, "indifferent" jurors; i.e., a jury must be composed of jurors who have not formed an opinion as to the defendant's guilt or innocence prior to trial. Irwin v.Dowd (1961), 366 U.S. 717, 722; State v. Lundgren (1995),73 Ohio St.3d 474, 479. However, to qualify as an "indifferent juror," it is not necessary that a prospective juror have no prior knowledge of the case:
 "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irwin at 722-723.
Therefore, under the general Irwin standard, the determination of whether pretrial publicity has resulted in a violation of a defendant's right to a fair trial will not turn upon whether the publicity has created an awareness of the case by the general public. Instead, the determinative factor will be whether the publicity was so great that the prospective jurors cannot set aside their prior knowledge and decide the case on its merits. State v. Haley (July 25, 1997), Greene App. No. 96-CA-50, unreported, 197 Ohio App. LEXIS 3428.
Consistent with the cited case law, Crim.R. 18(B) provides that a trial court can order the transfer of a case when it "appears" that a fair and impartial trial cannot be held within that court's jurisdiction. In applying this rule, the courts of this state have generally held that a motion for change of venue should be granted when, after reviewing the totality of the circumstances, the trial court concludes that the pretrial publicity has "likely" created an atmosphere in which an impartial jury simply cannot be seated. See, e.g., State v. Nobles
(1995), 106 Ohio App.3d 246, 257. Furthermore, it has been held that the decision to grant or deny a motion under Crim.R. 18(B) is within the sound discretion of the trial court. State v. Lewis (1993),85 Ohio App.3d 29, 36.
Usually, a trial court's decision on this issue will be based upon the examination of the prospective jurors during the voir dire process. Statev. Maurer (1984), 15 Ohio St.3d 239, 250-251. However, under certain circumstances, the amount of adverse publicity can be so pervasive that prejudice to the defendant will be presumed. Irwin. In Lundgren, though, the Supreme Court of Ohio emphasized that this type of case is extremely rare.
In Lundgren, the murder was the subject of approximately two hundred seventy articles in two local papers over an eight-month period. It was also the subject of three hundred fifty-five stories on three local television stations during that same time-span. Despite this, theLundgren court did not apply the presumption of prejudice to the case.Id. At 479. See, also, State v. Ritchie (July 25, 1997), Montgomery App. No. 15792, unreported, 1997 Ohio App. LEXIS 3421.
In this case, the record indicates that the murder in question was not the subject of the same amount of pretrial publicity as the murder inLundgren, supra. Although this case was reported on by various newspapers and television stations, the coverage was not unduly extensive. In his motion for change of venue appellant filed thirty-nine exhibits of newspaper articles covering this case. There is no evidence that the coverage here was such that it should be presumed to have been prejudicial to appellant.
If the presumption of prejudice does not apply, the existence of prejudice can only be established through the voir dire examination of the prospective jurors. In fact, the Supreme Court of Ohio has stated that any determination of a motion for a change of venue should be deferred until after the voir dire has been conducted. State v. Bayless (1976),48 Ohio St.2d 73, 97.
 "The examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." State v. Swiger (1966), 5 Ohio St.2d 151, paragraph one of the syllabus.
In affirming the overruling of motions for change of venue based upon the voir dire examination, Ohio courts have referred to a number of factors which support the conclusion that no prejudice has been demonstrated. For example, in Lundgren, the Supreme Court of Ohio enumerated the following facts: (1) the entire voir dire process had taken eight days and had included individualized questioning of each juror on the pretrial publicity issue; (2) the trial court had excused those jurors who had formed a fixed opinion regarding the defendant's guilt based upon the pretrial publicity; (3) those jurors who were ultimately seated on the jury did not appear to have been exposed to extensive publicity; and (4) those jurors who had stated that they had formed tentative opinions had indicated that they would be able to set aside their views and would decide the case solely upon the evidence presented at trial.
A similar analysis was followed by the Second Appellate District inHaley:
 "* * * We believe that voir dire in this case was sufficient to ensure Haley a fair trial. The transcript of voir dire is over 200 pages long. Most of the prospective jurors had been exposed to some pre-trial media coverage, and at least ten indicated that they would have difficulty being impartial. The court excused all of these jurors, and retained only those jurors who had either not heard any reports or could assure the court that they would be impartial. Those jurors did not have excessive exposure to media coverage and were subjected to individualized questioning about the impact of pretrial publicity." Haley at 51-52.
In the instant case, the entire voir dire process took seven full days and there was extensive questioning on the pretrial publicity issue. The record establishes that the transcript of voir dire is over eighteen hundred pages in length, and that the prospective jurors were asked a significant number of questions concerning media and media exposure.
In appellant's motion for change of venue the trial court clearly indicated his willingness to grant a change in venue if it became necessary where he stated:
 "THE COURT: Well . . . in my mind we keep getting closer to the line. I want to say for the record that I have contacted a judge in an adjoining county, I have made arrangements to move this trial if I had to. I think it is incumbent upon me to try to do that. With that said, uh, it is still my view, I am not going to rule on the motion for change of venue. It is still my view we should attempt to pick a fair and impartial jury in this county." (Motion Tr. 106).
Specifically, a review of the voir dire examination shows that the following questions were asked of the entire group of jurors:
 "I would like to ask you all as a group, and if you have a response to this question just raise your hand and then I will follow up individually with each of you. Have you read, seen, or heard anything regarding this case, based on my reading of the Indictment to you, prior to your summoning as a juror? How many have? (Jurors raise hands.) Keep your hands up, please. This is going to take a little bit of time. All right, you can put your hands down. (Jurors comply.)
"Those of you who have read, seen or heard anything, what has been your source of information regarding the case? Not what you heard, but where and under what circumstances have you heard it? Now, I will take you each individually. Mr. Tracy.
 "MR. TRACY: I have discussed it with people just in general.
"ATTY. HARTFORD: Okay, just general discussions?
"MR. TRACY: I've seen all the clippings, and stuff.
"ATTY. HARTFORD: Oh, okay. Newspaper reports. Ms. Hays.
"MRS. HAYS: Reports.
"ATTY. HARTFORD: Newspaper accounts?
"MRS. HAYS: yeah. And just what I heard. Talking about it.
"ATTY. HARTFORD: I understand. Mr. St. John?
 "MR. ST. JOHN: Same thing. Only whatever was on the television, and read in the newspapers.
"ATTY. HARTFORD: Mrs. Swartz?
"MRS. SWARTZ: Just coworkers talking.
"ATTY. HARTFORD: Mr. Baxter?
"MR. BAXTER: Just what I saw on television.
"ATTY. HARTFORD: Mr. Vazzo?
"MR. VAZZO: The media and coworkers.
"ATTY. HARTFORD: Mr. Harzen?
"MR. HARZEN: Me and my neighbors discussed it.
 "ATTY. HARTFORD: You haven't read any accounts, or anything?
"MRS. MENTZER: No.
"ATTY. HARTFORD: Ms. Mentzer?
"MRS. MENTZER: Newspapers. Just headlines.
 "ATTY. HARTFORD: You haven't really got into the detail of the story —
"MRS. MENTZER: — no.
"ATTY. HARTFORD: You have just seen —
"MRS. MENTZER: — you're right.
 "ATTY. HARTFORD: All right, now I am going to go into a little more detail with each one of you that had a response to that first question." (Tr. 1098-1100).
Appellant's counsel then went into extensive detail with each of the prospective jurors concerning what they had heard about the case.
 "ATTY. HARTFORD: Yes, Your Honor. Thank you. Right now, again, I hate to think I'm picking on you eight, but you are the ones that are responding. And this is kind of a double question, but I would like you to pay close attention to it.
"Based on what you have read, seen or heard in regard to this particular case, the first part of the question is have you formed an opinion as to the guilt or innocence of the Defendant, based upon the accounts that you have seen, heard or read? Not what that opinion is, but have you formed an opinion? Mr. Tracy?
"MR. TRACY: Yes, sir."
"ATTY. HARTFORD: Ms. Hays.
"MRS. HAYS: Yes.
"ATTY. HARTFORD: Mr. St. John?
"MR. ST. JOHN: Yes.
"ATTY. HARTFORD: Ms. Swartz?
"MRS. SWARTZ: Yes, sir.
"ATTY. HARTFORD: Mr. Baxter?
"MR. BAXTER: No.
"ATTY. HARTFORD: Mr. Vazzo?
"MR. VAZZO: Yes.
"ATTY. HARTFORD: Mr. Harzen?
"MR. HARZEN: Yes.
"ATTY. HARTFORD: Ms. Mentzer?
"MRS. MENTZER: Probably not. I don't think I know enough.
 "ATTY. HARTFORD: All right. Those of you who have formed an opinion, based upon what you have read, seen or heard regarding the accounts of this matter, do you feel within your own mind that you can set that opinion aside, realizing that you have no evidence in regard to this case? And keeping in mind Judge Bettis' instructions prior to your seating here.
 "Do you think you can set that opinion aside, and fairly and impartially hear the evidence and examine the physical evidence that will be presented to you from the witness stand, set that aside, and fairly and impartially judge and decide this particular case?
 "Mr. Tracy, I believe you indicated yes to that question. Do you think you can set aside what you heard in the media, and ignore it?
"MR. TRACY: No, I can't.
"ATTY. HARTFORD: Ms. Hays?
"MRS. HAYS: Yes.
"ATTY. HARTFORD: Mr. St. John?
"MR. ST. JOHN: No, that would be hard to do.
"ATTY. HARTFORD: Ms. Swartz?
"MRS. SWARTZ: Yes.
"ATTY. HARTFORD: Mr. Vazzo?
"MR. VAZZO: No, sir.
 "ATTY. HARTFORD: I believe that was all that indicated that they had formed an opinion.
 "You indicated probably you could, Ms. Mentzer. Can you put aside anything you have said — or anything that has — or anything that you have heard, excuse me? Or seen?
"MRS. MENTZER: Oh, sure.
"ATTY. HARTFORD: All right —
 "THE COURT: — now, before you go any further let's deal with those jurors. As far as I'm concerned they should be excused. Any . . . any —
"ATTY. HUTSON: No objection, Your Honor.
"THE COURT: Mr. Hartford?
 "ATTY. HARTFORD: Right, Your Honor. Could we possibly question them in a little more detail in regard —
"THE COURT: — sure.
 "ATTY. HARTFORD: Okay. Mr. Tracey, you indicated that you could not set aside your opinion.
 "Are you firmly entrenched in that opinion? You recognize that you haven't heard any evidence in this case. Is that correct?
"MR. TRACY: Yes.
 "ATTY. HARTFORD: Okay. Your primary source, you indicated was discussions from — amongst friends, and whatnot, coworkers, and also reading things in the newspapers. Do you recognize as Judge Bettis told you initially that newspaper reporters aren't privy to everything that goes on in a case, and they aren't always in court when hearings are held, or trials are held. And they don't always get all of the evidence. Do you understand that?
"MR. TRACY: Yes, I do.
 "ATTY. HARTFORD: And — and, you understand that newspapers are not sworn to tell the truth. We hope that they do, and we hope that they are responsible, but the evidence that you will hear from this witness stand will come from — from people who have taken an oath, and who are sworn to tell the truth.
 "And the Judge I anticipate will instruct you, you don't have to believe them just because they have taken an oath, but they are going to that extent. Do you understand that?
"MR. TRACY: Yes.
 "ATTY. HARTFORD: With that in mind, do you still feel that you have your opinion of the guilt or innocence of the Defendant is such that you cannot fairly and impartially hear this case?
 "MR. TRACY: That is true. Yes. I have formed an opinion. I shouldn't have. But I just have.
 "ATTY. HARTFORD: Sure. I understand. I understand. Mr. St. John, keeping in mind what I have just indicated to Mr. Tracy, that the witnesses you will hear and the evidence that you will see will come from people who have sworn to tell the truth.
 "The opinion that you have formed, whether it is for guilt or innocence, it doesn't make any difference, keep in mind that both the State and the Defendant are entitled to a fair trial in this case, can you set aside the opinions that you formed in this case and fairly and impartially hear the evidence from the witness stand, and decide this case?
 "MR. ST. JOHN: I doubt it. If I had known I was going to be on the jury I wouldn't have read all that stuff.
"ATTY. HARTFORD: Well, I understand. Mr. Vazzo?
"MR. VAZZO: I have a definite bias going into this.
 "ATTY. HARTFORD: You are prejudice to the point that you don't feel that you could comfortably sit on this jury, and fairly and impartially hear the case, both from the State's prospective and the Defendant's prospective?
 "MR. VAZZO: It's in question. I, I — like I say, I have a definite bias, I would rather not have to do it.
"ATTY. HARTFORD: Well, I understand —
"MR. VAZZO: — I'm afraid, you know . . .
 "ATTY. HARTFORD: You don't think in your own mind you can reconcile yourself to fairly and impartially hear evidence one way or the other and decide the case?
"MR. VAZZO: (No audible response.)
 "ATTY. HARTFORD: I realize it is a difficult thing to do, and let me suggest something to all three of you jurors that have been questioned in this regard, the Judge has mentioned to you we don't expect you come in here out of a vacuum. Each one of us, myself, the defense, the Judge, each one of you brings certain prejudices, and ideas, and understandings, in ways that you can comprehend things into this courtroom. And that uniqueness of us all is what our system of justice is all about. That's how we get a varied panel. And that's how we came up with fair and impartial verdicts. Do you understand that?
"MR. VAZZO: Um huh (indicating yes.)
 "ATTY. HARTFORD: But you still feel that in light of all of that, that you don't think you can fairly and impartially try this case?
"MR. VAZZO: That's correct.
"THE COURT: Can we agree to excuse these three jurors?
"ATTY. HARTFORD: Yes, Your Honor.
"THE COURT: Mark?
"ATTY. HUTSON: Defense would agree.
 "THE COURT: All right. I appreciate all three of your honesty. That's the way we have to be, and you may be excused. Those three jurors. (Mr. Tracy, Mr. St. John and Mr. Vazzo were excused and stepped down.) I need three more." (Tr. 1102-1108).
The transcript before us further manifests that when a prospective juror stated that he could not set aside his opinion as a result of the pretrial publicity, the trial court did excuse such a juror for cause. This procedure was followed numerous times during this aspect of the voir dire process. The remaining jurors were able to say that they could set aside the information they had heard previously in the media and decide the case solely upon the evidence offered at trial.
The Supreme Court of Ohio has consistently stated that deference should be given to the determination of the trial court because it is in the best position to judge the juror's demeanor and fairness.
Upon reviewing the transcript of the entire voir dire exercise, we conclude that the pretrial publicity in this case was not so extensive so as to prevent the trial court from selecting a fair and impartial jury. Thus, because the trial court did not abuse its discretion in overruling appellant's motion for a change of venue, the fourteenth assignment of error in this appeal is without merit.
 O
In assignment of error fifteen, appellant alleges the cumulative effect of errors denied him a fair trial and due process. Specifically, here appellant alludes to the extensive publicity surrounding the trial, the gruesome photographs, the circus "photo op" environment around the secret indictment, and the credibility of the prosecution testimony of Mr. Springer and Mr. Thomas.
In assignment of error fourteen, we have held that the pretrial publicity, although extensive, was not so pervasive so as to deny appellant of an impartial jury and a fair trial. In assignment of error seven we have held that the photo evidence admitted was gruesome but was not cumulative and was relevant to the issues before the jury. The credibility of the testimony of Mr. Springer and Mr. Thomas was for the jury to decide and any error concerning their testimony has not been raised in this appeal. Finally, appellant fails to identify how the circumstances surrounding his indictment and arrest deprived him of a fair trial and due process.
Finally, as to cumulative error, a conviction will be reversed where the cumulative effect of errors during the course of a trial deprives a defendant of the constitutional right to a fair trial despite the fact that each error individually does not constitute cause for reversal.State v. DeMarco (1987), 31 Ohio St.3d 191, 196-197. However, the doctrine of cumulative error is not applicable in the event the appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995), 74 Ohio St.3d 49, 64. We find no error in this case and thus the doctrine of cumulative error is not applicable.
This assignment of error is without merit.
 INDEPENDENT REVIEW
R.C. 2929.05(A) provides that after an appellate court has reviewed and analyzed a death penalty judgment in the same manner as it would a judgment in any other type of criminal case, the court is further required to independently review the evidence presented at trial and determine if the imposition of the death penalty was warranted. As such, we will now proceed with said independent review to determine if the imposition of the death penalty was warranted.
Under R.C. 2929.05(A), an appellate court's independent review of the imposition of the death penalty involves a three-step process. First, we must review the record to determine whether the evidence supports the finding that the aggravating circumstance was established beyond a reasonable doubt. Second, we must reweigh all the evidence presented at trial to determine if the aggravating circumstance outweighs the mitigating factors. Third, we are required to decide if the imposition of the death penalty in this case was disproportionate or excessive in comparison to other cases in which the death penalty has previously been imposed.
In the first step of our independent review, we note that the appellant was charged with two specifications as delineated in R.C. 2929.04(A)(3) and 2929.04(A)(8), for the one count of aggravated murder by prior calculation and design. Under these sections of the Ohio Revised Code, criteria are defined which must be met prior to imposing the death penalty for aggravated murder. The statute states in relevant part:
 "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
"* * *
 "(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.
"* * *
 "(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding."
Appellant in this case was found guilty of the sole count of aggravated murder by prior calculation and design along with specification one, being R.C. 2929.04(A)(3), (Murder to Escape Detection), specification two, being R.C. 2929.04(A)(8), (Murder of Witness). In the penalty phase of the trial the jury recommended the sentence of death on the count of aggravated murder. The trial court then sentenced appellant to death.
As defined under R.C. 2901.22, an individual acts with purpose when he acts with a "specific intention to cause a certain result." The voluntariness of appellant's actions, his purchase of a meat saw prior to his actions, the testimony that appellant and his victim had, in fact, been guilty of arson, supported a finding that appellant acted purposely in killing Lynn Hanna. No evidence supports a finding that appellant acted on an impulse or that the killings were the result of an instantaneous eruption of events. Appellant's actions and statements in conjunction with the manner in which he killed Lynn Hanna indicates he acted with purpose. Therefore, it must be held that the evidence supports beyond a reasonable doubt a finding that appellant did purposefully murder Lynn Hanna as part of a course of conduct as provided for in R.C.2929.04(A)(3) and 2929.04(A)(8).
Further, in this case we are presented with dual testimony concerning the joint arson which was planned by Lynn Hanna and the appellant, and the later suspect fire which occurred. There was testimony concerning a disagreement between the victim and appellant as recent as three days before her disappearance whereby he knocked her down, kicked her, and choked her.
We have evidence in the record that appellant requested a friend to provide him an alibi for a specific period of time. Then we have the transferral of the victim's real estate and trailer by the appellant, to the appellant, just after Lynn Hanna disappeared. We are also presented with testimony of the distribution of Lynn Hanna's personal effects by appellant just after her disappearance.
The record also reflects testimony concerning the purchase of a meat saw by the appellant, of the type used in butchering, just before Lynn Hanna disappeared. We also find on the record testimony concerning the appellant's almost professional ability to butcher deer, followed by testimony, upon the discovery of the dismembered body of Lynn Hanna, concerning the manner in which the body was dissected.
About the time the body would have been deposited in the Ohio River, the record reveals testimony concerning the discovery of a nervous appellant by a West Virginia Deputy Sheriff at a location near where the body parts could have been placed in the river.
Then the record reflects the appellant taking Lynn Hanna's ring to be resized for him, along with testimony that the recovered body appeared to have had a ring removed from her hand.
Finally, and most important, we find on the record the testimony by appellant's son and his friend that the appellant told them that he killed Lynn Hanna to prevent her from turning him in for the arson.
This evidence, if believed by the trier of fact, would tend to prove that the appellant did not act on impulse or that the killing was not the result of an instantaneous eruption of events. There was further testimony by appellant's son that appellant went back to the victim a day later and when he found her still alive he shot her. If believed by the jury, this testimony would lead them to believe that appellant acted with specific intent and prior calculation and design to kill Lynn Hanna, to prevent her from involving appellant in the arson of her property.
Having determined that the aggravating circumstance was established beyond a reasonable doubt, this court now turns its focus to the second step of its independent review. We must now determine whether the aggravating circumstance outweighs any mitigating factors established by appellant. R.C. 2929.04(B) sets forth a specific list of factors which must be considered in favor of the defendant if they are proven by the evidence:
 "(1) Whether the victim of the offense induced or facilitated it;
 "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
"(4) The youth of the offender;
 "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
In addition to the foregoing factors, R.C. 2929.04(B) provides that the history, character and background of the defendant can be weighed against the aggravating circumstance along with the nature and circumstances of the offense. However, in relation to the latter consideration, an appellate court is not always required to consider the nature and circumstances of the offense in favor of the defendant. The Ohio Supreme Court has held that, when the facts of a specific case so warrant, the nature and circumstances of the offense can be cited as supporting the finding that the aggravating circumstance outweighs the mitigating factors. State v. Moreland (1990), 50 Ohio St.3d 58, 69. Furthermore, the trial court need not give mitigating weight to an offender's history, background and character if it finds said factors do not warrant such weight. State v. Green (1993), 66 Ohio St.3d 141, 150.
We are mindful that only the aggravating circumstances may be weighed against the mitigating circumstances. State v. Davis (1988),38 Ohio St.3d 361, 367-373. Further, the mitigating circumstances must be considered collectively, State v. Dickerson (1989), 45 Ohio St.3d 206,213, and all mitigating evidence must be considered. State v. Lawrence
(1989), 44 Ohio St.3d 24, 27.
Based on our review of the record, mitigating factors one, two, three, four and six are inapplicable to the instant action. There was no evidence introduced that the victim induced or facilitated this murder, aside from the indication that she might be going to implicate appellant in the arson. (R.C. 2929.04(B)(1). Also, there was no evidence submitted to show that the appellant was under duress, coercion or strong provocation at the time of the killing. R.C. 2929.04(B)(2). There was no evidence introduced to indicate that appellant, at the time of the crime, suffered from a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law. R.C. 2929.04(B)(3). At the time of the murders appellant was sixty years of age. R.C. 2929.04(B)(4). Appellant was the principal and sole offender in this killing. R.C. 2929.04(B)(6).
Appellant was given great latitude in presenting evidence in mitigation. He submitted evidence in mitigation both under R.C.2929.04(B)(5) and (7). The sheriff testified that the defendant did not cause a problem at the county jail while an inmate there. He further testified so far as he knew from his records, the defendant did not have a record of felony conviction, thus satisfying R.C. 2929.04(B)(5).
Under R.C. 2929.04(B)(7), appellant's brother testified that their father had died when he was five years of age, that appellant helped rear him, keep him out of trouble, and bought him his first car, and that appellant had a seven year old son, who will now be without a father, and who will suffer serious mental problems if his father is sentenced to prison or sentenced to death.
Appellant then called his former wife, who testified that she was married to appellant for a few months and divorced him, but that she had known appellant for a number of years. Further, she testified that during the time she knew him, he did not physically or mentally abuse her, and that he was a good father to his minor child.
The appellant was permitted to give an unsworn statement, blaming everyone for his crime but himself. He sought to blame the sheriff for all of his troubles by making statements about the sheriff's wife. He further sought to blame the jury for finding him guilty of aggravated murder and failing to comply with their oath. An effort was made by the appellant to blame others for his conviction.
While an appellant's history and background must be considered, they need not necessarily be afforded significant weight. This proposition is clearly illustrated in State v. Rogers (1985), 17 Ohio St.3d 174, when the Ohio Supreme Court held:
 "During the sentencing phase of his trial appellant presented evidence of the following mitigating factors: (1) his twelve-year institutionalization from age ten to age twenty-two, (2) his mental retardation, (3) his limited (third grade) education, (4) his limited ability to read and write, (5) his lack of familial support, and (6) his history of alcoholism. After careful consideration of the cumulative effect of these mitigating factors on appellant at the time he took the life of Lisa Bates, we can come to no other conclusion than that these factors do outweigh the heinous nature of the aggravating circumstances surrounding her murder." Id. At 187.
After considering the combined evidence on the statutory mitigating factors and the residual mitigating factors, this court finds minimal weight in their favor. Balanced against this was the aggravating circumstance of the crime. The State of Ohio elected to present as aggravating circumstances the first and second specification.
On the date of the fire, December 20, 1985, the appellant and Lynn Hanna had established an intimate relationship; Lynn Hanna was divorced but appellant was not divorced at that time. Prior to the fire at the home that was burned, Lynn Hanna and the appellant, Gordon Reynolds, planned to burn the house because her former husband had failed to make the mortgage payments. They feared that the bank would file the necessary legal papers to foreclose on the property. The planning was done in the presence of the victim's two children. The victim, Lynn Hanna, told her children that they should put together their personal effects and remove them prior to December 20, 1985.
The two children testified that they boxed up their personal effects, that when they were leaving their mother's home after they were told by the appellant and their mother that the house was going to burn. They were told by the appellant to "make sure that you get your personal belongings out." The victim's two children also testified that they observed the major household items, T.V., VCR and other major items were removed from the house and replaced with older furniture.
They also testified that there was an old car, not driven by the appellant or their mother, placed in the garage. They further testified that later at Gordon Reynolds' home, they saw the furniture that was originally located at their mother's home; i.e. the television, VCR and major household items.
The fire occurred on December 20, 1985. The local fire chief called in the assistance of the State Fire Marshall's Office who investigated the fire and found it to be deliberately set, but he did not have sufficient evidence, at that time, to take the matter to the police authorities.
After the fire, nothing much occurred in the investigation until a missing person's report was filed with the police department by Lynn Hanna's daughter in September of 1988. Shortly after that, the body parts of Lynn Hanna were found in the Ohio River.
In 1994, the appellant's son, Gordon, got into trouble in West Virginia and was convicted of drug charges. In order to stay out of jail, he contacted the prosecutor in West Virginia and told them about his knowledge of the murder of Lynn Hanna by his father.
Appellant's son's testimony relates to Specifications I and II, his son testifying that appellant told him on a morning, while under the influence of alcohol, "I killed Lynn, cut her up and threw her in the river. She was going to cause problems because of the fire."
A friend of the appellant, who had been wired by the sheriff, testified that the appellant told him, "I had to kill her because of the fire. She planned to go to authorities." This is direct evidence which is credible and clearly supports proof beyond a reasonable doubt of the guilt of the appellant of the two specifications.
The appellant not only killed Lynn Hanna and cut her up but dissected interior parts of her body, including her heart, which was still hanging, for the purpose of talking to it, according to one witness.
In the settlement of the fire loss with Lynn Hanna and her husband's insurance company, the damage to the property was paid to the bank to satisfy two mortgages. Lynn Hanna submitted a proof of loss for fire damage to her personal property, household goods and furnishings. The claim was in excess of $30,000, but the coverage was limited to $25,000.
Appellant obtained a power of attorney from Lynn Hanna and insisted to the claims' adjustor that the check be made payable to him. The insurance company declined, and the appellant, along with Lynn Hanna, made a visit to the insurance adjustor's office. The appellant threatened bodily harm to the insurance adjustor if the money was not paid to him.
The $25,000 was paid after Lynn Hanna had revoked the power of attorney. During the period of time that the personal property, household goods and furnishings claim had been pending and was paid, the appellant made a deposit of approximately $12,000 in his personal bank account or approximately one-half of the $25,000 paid by the insurance company.
In considering the nature and circumstances of the offense, we do not find anything of record which would weigh in favor of mitigation. In fact, the nature and circumstance of the offense support a finding that the aggravating circumstance outweighs the mitigating factors. As had been addressed on numerous occasions, the events surrounding the killing support a finding that appellant acted purposely and without significant provocation. The evidence does not indicate that appellant acted impulsively or without knowledge of what was transpiring.
R.C. 2929.04(C) states, in relevant part:
 "The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender, but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing."
In summation, we accord little weight to the evidence appellant submitted concerning the mitigating factors set forth in R.C. 2929.04(B)(5) and 2929.04(B)(7). Similarly, appellant's history, character and background offer little in the way of mitigating weight. In contrast, we accord considerable weight to the aggravating circumstance and the nature and circumstances of the crime. Consequently, we find beyond a reasonable doubt that the sole aggravating circumstance of appellant's purposeful taking of an innocent life outweighs the cumulative effect of all relevant mitigating factors.
Under the final step of this analysis, this court is required to determine if the imposition of the death penalty in the instant case is excessive or disproportionate in comparison to other death penalty cases under our jurisdiction. This court has previously rendered decisions in seven capital cases, but none of these prior cases can be deemed similar to the case sub judice.
In the case of State v. Gerish (Apr. 22, 1999), Mahoning App. No. 92 C.A. 85, unreported, this court affirmed the conviction and death sentence of a man convicted of killing his mother and an innocent bystander. This was the only case where the multiple-murder aggravating circumstance under R.C. 2929.04(A)(5) was the sole aggravating circumstance. In Gerish, the defendant actually had abused alcohol and drugs. This evidence was not found to be sufficient to counter the aggravating circumstances.
In other cases such as in State v. Rosalie Grant (Nov. 9, 1990), Mahoning App. No. 83 C.A. 144, unreported, this court affirmed the conviction and death sentence of a woman convicted of the purposeful killing of her two children during an aggravated arson.
In State v. Hudson (May 29, 1993), Jefferson App. No. 88-J-40, unreported, Hudson had been convicted of the kidnaping and purposeful killing of another man. The facts showed that Hudson and three other men lured the victim from his home by telling him that a friend needed his help, then drove the victim to a remote area where he was beaten, stabbed and shot. On appeal, this court reversed Hudson's death sentence.
In State v. Eley (Dec. 20, 1995), Mahoning App. No. 87 C.A. 122, unreported, this court affirmed the death sentence of defendant after his conviction of aggravated murder with a death penalty specification that the murder was committed during or immediately after the commission of an aggravated robbery. The defendant killed the owner of a grocery store during a robbery attempt committed with the assistance of an accomplice.
In State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28, unreported, this court affirmed the death sentence of defendant after his conviction on two counts of aggravated murder with the death penalty specification that the murders were committed during the course of aggravated robbery. The defendant and an accomplice murdered and robbed two victims leaving their bodies along a roadside.
In State v. Spivey (Jan. 13, 1997), Mahoning App. No. 89 C.A. 172, unreported, this court affirmed the death sentence of defendant after his conviction of aggravated murder with the death penalty specification that the murder was committed during the course of an aggravated burglary, aggravated robbery and grand theft of a motor vehicle. Mr. Spivey broke into an individual's home, stabbed her and brutally beat her to death before robbing the house and fleeing the scene in the victim's automobile.
In State v. Raymond A. Twyford, III (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported, Twyford and another man were convicted of the kidnaping, robbery and murder of a man. Twyford had deceived the individual into believing that he was going hunting. The defendants mutilated the body of the victim before disposing of it. This court affirmed Twyford's death sentence.
None of the above cases involve the situation where R.C. 2929.04(A)(3), Murder to Escape Detection, or R.C. 2929.04(A)(8), Witness Murder, was the aggravating circumstance. Thus, we find that since none of these cases are sufficiently similar so as to suffice for proportionality purposes, we must look to similar cases decided by the Ohio Supreme Court to substantiate our proportionality review.
The Supreme Court has reviewed many death penalty cases where the aggravating specification was either under R.C. 2929.04(A)(3) or2929.04(A)(8) or both. See State v. Hooks (1988), 39 Ohio St.3d 67; Statev. Wickline (1990), 50 Ohio St.3d 114; State v. Lawson (1992),64 Ohio St.3d 336; State v. Keene (1998), 81 Ohio St.3d 646; State v.Coleman (1999), 85 Ohio St.3d 129; State v. Chinn (1999),85 Ohio St.3d 548; State v. Filiaggi (1999), 86 Ohio St.3d 230; and Statev. Smith (2000), 87 Ohio St.3d 424.
Out of the above cases, the Supreme Court has affirmed the death penalty in all the cases. In Wickline, supra, and Chinn, supra, the sole aggravating specification was R.C. 2929.04(A)(3) (Murder to Escape Detection). In Keene, supra; Coleman, supra and Smith, supra, the sole aggravating specification was R.C. 2929.04(A)(8), (Witness Murder). InHooks, supra, Lawson, supra, and Filiaggi, supra, there were dual specifications of R.C. 2929.04(A)(3) and (8) as in our case.
In Wickline, supra, the facts were similar to our case. The case involved multiple murders, where Wickline dismembered the bodies, placed them in garbage bags. The body parts were never found. In mitigation,Wickline claimed the victims induced or facilitated the killing, that he was under duress and was very young. The Supreme Court upheld the death sentence and cited to Hooks, supra in finding the sentence proportional.
In the case of Keene, supra, the court found "several mitigating factors exist here, including appellant's youth, clean record, mental disorders, his remorse and confession, and the repeated traumatic loss of the father figures from his life." (81 Ohio St.3d 671). The court, here again, affirmed the death sentence and found it proportional.
In the case of Hooks, supra, where the aggravating specifications were "witness murder" and "murder to escape detection" as in our case, the appellant offered as mitigation, evidence of his low intelligence and that the appellant was under duress. The Supreme Court there affirmed the death sentence.
In the case of Lawson, supra, where the aggravating specifications were again "witness murder" and "murder to escape detection" the appellant offered as mitigation evidence, his diminished mental capacity, the fact that he was under duress and evidence of other factors including his past history, character evidence and his background. The Supreme Court there affirmed the death sentence citing to Hooks, supra and Wickline, supra in finding the sentence proportional.
In the case of Smith, supra, where the aggravating specification was R.C. 2929.04(A)(8), (witness murder), the mitigation evidence introduced by the appellant was evidence of appellant's history, character and background, in the form of the love and support of his family and his drug problem. The Supreme Court gave this evidence minimal weight in affirming the death sentence and citing for proportionality to the cases of Keene, supra; Coleman, supra; Lawson, supra; and Hooks, supra.
In all the other cases decided by the Ohio Supreme Court the court affirmed the death sentence with mitigation evidence at least equal to that in the instant case and found the sentences proportional to others before the court.
Based upon the foregoing, we find that under R.C. 2929.05 the death sentence imposed upon appellant herein is not disproportionate to the penalty imposed in similar cases decided by the Ohio Supreme Court. Therefore, the death penalty was appropriate and the judgment of the trial court is affirmed.
Vukovich, J., concurs, Waite, J., concurs.